Eugene P. Ramirez (State Bar No. 134865)
  eugene.ramirez@manningkass.com
Craig Smith (State Bar No. 265676)
  craig.smith@manningkass.com
Kayleigh Andersen (State Bar No. 306442)
  kayleigh.andersen@manningkass.com
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendant, BRYAN MORALES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ANGELINA ATABEKOVA-MICHAELIDIS, and VARDOUI MICHAELIDOU; both individually and as successors-in-interest to Decedent, MELKON MICHAELIDIS, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES; BRYAN MORALES; and DOES 1-10, INCLUSIVE, <br><br> Defendants. | Case No. 2:22-CV-05620-MCS-MAA <br><br> *[The Hon. Honorable District Judge, Mark Scarsi, Magistrate Judge, Maria A. Audero]* <br><br> **DEFENDANT OFFICER MORALES' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT** <br><br> **[Fed. R. Civ. P. 56]** <br><br> *[Filed concurrently with Defendant Officer Morales' Separate Statement of Uncontroverted Facts and Conclusion of Law; Declaration of Kayleigh Andersen; (Proposed) Order]* <br><br> Date:    July 24, 2023 <br> Time:    9:00 a.m. <br> Dept.:   7C, 7th Floor <br><br> Trial Date:    October 31, 2023 <br> Complaint Filed:  August 9, 2022 |

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on July 24, 2023, at 9:00 a.m. or as soon thereafter as the matter may be heard, in Courtroom 7C (7th Floor) of the above entitled court (First Street Courthouse) located at 350 W. 1st Street, Courtroom 7C, 7th Floor, Los Angeles, California 90012, Defendant Officer Bryan Morales ("Officer Morales") will seek an Order from this Court granting Summary Judgment or Adjudication in his favor and against Plaintiffs Angelina Atabekova-Michaelidis, and Vardoui Michaelidou; both individually and as successors-in-interest to Decedent Melkon Michaelidis (collectively "Plaintiffs") as to one or more causes of action against him, pursuant to Federal Rules of Civil Procedure, Rule 56.

This Motion is based upon the grounds that there are no triable issues of material fact and that moving defendants are entitled to judgment as a matter of law, as follows:

**Issue 1:**       Officer Morales is entitled to judgment in his favor as to Plaintiffs' First Cause of Action pursuant to 42 U.S.C. section 1983 for excessive force because his use of deadly force was objectively reasonable under the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386 (1989).

**Issue 2:**       In addition, Officer Morales is entitled to qualified immunity because any mistakes of fact or law he may have made were reasonable, and his actions did not violate clearly established law. *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Mullenix v. Luna*, 136 S. Ct. 305, 310 (2015).

**Issue 3:**       Officer Morales is entitled to judgment in his favor as to Plaintiffs' Second Cause of Action pursuant to 42 U.S.C. section 1983 based on denial of medical care because the uncontroverted facts establish that the Decedent was provided medical aid and emergency medical personnel were immediately requested to respond both at the scene of the initial vandalism incident at Decedent's residence and at the scene where the use of force occurred. In addition, there is no evidence showing that Officer Morales violated any rights that were "clearly

2

established" at the time of the alleged violation, and he is therefore entitled to qualified immunity.

**Issue 4:**    Officer Morales is entitled to judgment in his favor as to Plaintiffs' Third Cause of Action pursuant to 42 U.S.C. section 1983 based on denial of familial relationship because there is no evidence that he acted with deliberate indifference or with a purpose to harm unrelated to a legitimate law enforcement objective. In addition, there is no evidence showing that Officer Morales violated any rights that were "clearly established" at the time of the alleged violation, and he is therefore entitled to qualified immunity.

**Issue 5:**    The state claims – the seventh claim for battery and the eighth claim for negligence – also fail as a matter of law because the force used by Officer Morales was objectively reasonable under the circumstances. For the same reasons that no constitutional violations were committed, no state torts were committed, either. *See Martinez  v. County of Los Angeles*, 47 Cal. App. 4th 334, 349-50 (1996).

**Issue 6:**    Plaintiffs' ninth cause of action for violation of the Bane Act (Civil Code §52.1) lacks merit because there is no evidence of any specific intent by Officer Morales to violate the Decedent's constitutional rights.  *Reese v. County of Sacramento*, 888 F.3d 1030, 1043-1044 (9th Cir. 2018).

**Issue 7:**    There is no merit to any punitive damages claims because: (a) there is no evidence that Officer Morales acted with malice, oppression, or reckless disregard toward the Decedent.  *See Dang v. Cross*, 422 F.3d 800, 810 (9th Cir. 2005); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 259-271 (1981).

This Motion will be based upon this Notice, the Memorandum of Points and Authorities, the Declaration of Kayleigh Andersen and any exhibits attached thereto, the Separate Statement of Uncontroverted Material Facts and Conclusions of Law, all pleadings, records, and papers on file in this action, and upon such other oral and documentary evidence as may be presented at the hearing of this Motion.

/ / /

**NOTICE ON CONFERENCE OF COUNSEL PER LOCAL RULE:**

Prior to the filing of the motion, on June 5, 2023, defense counsel sent Plaintiffs' counsel a comprehensive meet and confer letter inviting discussions regarding the dispositive issues presented in the Motion; on June 8, 2023, the parties met and conferred telephonically. The parties were unable to resolve the issues informally.  See Declaration of Kayleigh Andersen, ¶ 2.

DATED:  June 16, 2023              **MANNING & KASS**
                                   **ELLROD, RAMIREZ, TRESTER LLP**


                                   By:   /s/ Kayleigh A. Andersen
                                         Eugene P. Ramirez
                                         Kayleigh A. Andersen
                                         Attorneys for Defendant, BRYAN
                                         MORALES

MANNING | KASS

Defendant Officer Morales' Notice of Motion and Motion for Summary Judgment or, Alternatively, Partial Summary Judgment

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................. 1

II.   STATEMENT OF FACTS .................................................... 2

    A.    Officers and LAFD Respond to Initial Vandalism Incident ................. 2

    B.    911 Calls Regarding Michaelidis Armed with Knives ....................... 3

    C.    Officer Morales Requested Less-Lethal Options be Used during Encounter with Michaelidis ..................................................... 4

    D.    Michaelidis Posed an Immediate Threat to the Officers ..................... 5

III.  LEGAL STANDARD ........................................................... 7

IV.   PLAINTIFFS CANNOT CARRY THEIR BURDEN OF ESTABLISHING ANY VIABLE FEDERAL CLAIM ................................ 8

    A.    Michaelidis Posed an Immediate Threat to the Officers' Safety ........... 8

    B.    Officer Morales' Use of Force was Objectively Reasonable ............... 9

    C.    Officer Morales is Entitled to Qualified Immunity ....................... 12

    D.    Plaintiffs' Denial of Medical Care Claim is Without Merit ............... 15

    E.    Plaintiffs' Claim for Denial of Familial Relationship also Fails .......... 16

V.    PLAINTIFFS' STATE LAW CLAIMS SHOULD ALSO BE DISMISSED ................................................................... 17

    A.    Plaintiffs' Battery Claim Fails as Officer Morales' Use of Force was Objectively Reasonable ..................................................... 17

    B.    Plaintiffs' Negligence Claim also Fails .................................. 18

    C.    Plaintiffs' Bane Act Claim Fails as a Matter of Law...................... 19

VI.   CONCLUSION .................................................................. 21

MANNING | KASS

# **TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

*A. D. v. State of Cal. Highway Patrol*, 712 F.3d 446 (9th Cir. 2012) ......................16

*Ashcroft v. al-Kidd,* 563 U.S. 731 (2011)................................................................13

*Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005) ............................11

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ..............................................................13

*Buchanan v. City of San Jose*, 782 F. App'x 589 (9th Cir. 2019) ..........................11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).........................................................7

*City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765 (2015) ...................9

*City of Escondido v. Emmons*, 139 S. Ct. 500 (2019) .............................................13

*Davis v. Scherer*, 468 U.S. 183 (1984) ...................................................................13

*Estate of Hernandez v. City of Los Angeles*, 2021 U.S. Dist. LEXIS 155185 .........10

*Fewell v. California*, 2017 WL 6043080 (C.D. Cal. Apr. 11, 2017) ......................16

*Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th Cir. 2014) ...................................17

*Graham v. Connor*, 490 U.S. 386 (1989) ..................................................................2

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)............................................................12

*Heien v. North Carolina*, 135 S. Ct. 530 (2014) .......................................................9

*Isayeva v. SacSheriff's Dept.*, 872 F.3d 938 (9th Cir. 2017)...................................11

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018) ..............................................................13

*Maddox v. Los Angeles*, 792 F.2d 1408 (9th Cir. 1986)...........................................15

*Malley v. Briggs*, 475 U.S. 335 (1986)...................................................................13

*O'Doan v. Sanford*, 991 F.3d 1027 (9th Cir. 2021) .................................................2

*Pearson v. Callahan*, 555 U.S. 223 (2009) ..............................................................2

*Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008).....................................................16

*R.E. v. City of Long Beach*, 2022 U.S. Dist. LEXIS 118125 (C.D. Cal. July 5, 2022)...................................................................................................................10

*Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir. 2018) .............................. 20

*Ryburn v. Huff*, 132 S. Ct. 987 (2012) ......................................................... 9

*Satey v. JPMorgan*, 521 F.3d 1087 (9th Cir. 2008) ................................... 21

*Scott v. Harris*, 550 U.S. 372 (2007) .......................................................... 1

*Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) ............................... 9

*Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090 (9th Cir. 2006) .................. 15

*Taylor v. Barkes*, 135 S. Ct. 2042 (2015) ............................................... 13

*Tennessee v. Garner*, 471 U.S. 1 (1985) ................................................. 12

*Watkins v. City of San Jose*, 2017 U.S. Dist. LEXIS 68648, 2017 WL 1739159 (N.D. Cal. May 4, 2017) .................................................. 10

*Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010) .................................. 10

## STATE CASES

*Amylou R. v. Cnty of Riverside*, 28 Cal.App.4th 1205 (1994) ................... 19

*Austin B. Escondido Union School District*, 149 Cal.App.4th 860 (2007) .............. 20

*Brown v. Ransweiler*, 171 Cal.App.4th 516 (2009) ................................... 17

*Cornell v. City and County of San Francisco*, 17 Cal.App.5th 766 (2017) ............. 20

*Hayes v. County of San Diego*, 57 Cal.4th 622 (2013) .............................. 18

*Hooper v. City of Chula Vista*, 212 Cal.App.3d 442 (1989) ...................... 19

*Jones v. Kmart Corp.*, 17 Cal.4th 329 (1998) .......................................... 20

*Munoz v. City of Union City*, 120 Cal.App.4th 1077 (2004) ..................... 17

*Shoyoye v. Cnty. of Los Angeles*, 203 Cal.App.4th 947 (2012) ................ 20

*Venegas v. County of Los Angeles*, 32 Cal.4th 820 (2004) ...................... 20

## FEDERAL STATUTES

42 U.S.C. § 1983 ......................................................................................... 12

Fed. R. Civ. P. 56 ......................................................................................... 2

Defendant Officer Morales' Notice of Motion and Motion for Summary Judgment or, Alternatively, Partial Summary Judgment

**STATE STATUTES**

Cal. Gov. Code § 820.2 ...........................................................................19

Cal. Gov. Code § 821.6 ...........................................................................19

Cal. Gov. Code § 845.8 ...........................................................................19

Cal. Pen. Code § 196 ...............................................................................18

Cal. Pen. Code § 415 .................................................................................8

Cal. Pen. Code § 417(a) .............................................................................8

Cal. Pen. Code § 594 .................................................................................8

MANNING | KASS

**Defendant Officer Morales' Notice of Motion and Motion for Summary Judgment or, Alternatively, Partial Summary Judgment**

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Officer-involved shootings often originate from tense and volatile situations where officers are forced to make split-second decisions to defend themselves and the public they serve. On October 31, 2021, just after 5:00 p.m., neighbors called 911 about a crazed suspect, Melkon Michaelidis ("Michaelidis"), who was armed with two knives, covered in blood, and roaming the street. According to one witness, there was a "guy with a knife popping tires" and "coming up to people." On the surveillance video, Michaelidis is seen with his bloody hands using the knives to stab tires and the hood of a moving car being driven by an unsuspecting driver.

The officers responded to the 911 calls and encountered Michaelidis in the middle of a street wielding a large knife in each hand. Over the next few minutes, Michaelidis refused to comply with the officers' numerous commands to drop the knives. As the unpredictable situation unfolded, Michaelidis put down one knife and got onto his knees, but still held the other 9.5 inch knife blade in his right hand. Michaelidis then stood up from the ground holding the knife, which he then transferred to his left hand. When Michaelidis started advancing toward the officers in front of him, he had the knife in his left hand and his right index finger pointed directly at the officers. Officer Morales, observing Michaelidis rapidly closing the distance, was forced to make a split-second decision. Under the totality of the circumstances, Officer Morales acted appropriately in response to an immediate threat.

As the videos of the incident clearly demonstrate, Officer Morales' actions were objectively reasonable under the totality of the circumstances.[1]  First,

---

[1] *Scott v. Harris*, 550 U.S. 372 (2007), where the facts of a police interaction are captured on videotape, they may be deemed undisputed for purposes of ruling on a summary judgment motion.

Plaintiffs' federal claims are barred because the uncontroverted facts demonstrate that Officer Morales' actions were reasonable as a matter of law pursuant to *Graham v. Connor*, 490 U.S. 386 (1989) and were for a legitimate law enforcement objective. Second, Officer Morales – one of four officers at the scene who perceived Michaelidis to be an immediate threat – is entitled to qualified immunity, which serves to protect officers from liability for mistakes of law, mistakes of fact, or mistakes based on mixed questions of law and fact.  *Pearson v. Callahan*, 555 U.S. 223, 230 (2009).  Here, Plaintiffs cannot prove that "clearly established law" prohibited Officer Morales from using the degree of force that he did in the specific circumstances that he confronted.  *O'Doan v. Sanford*, 991 F.3d 1027, 2037 (9th Cir. 2021). Third, there is no denial of medical care claim as medical care was summoned for Michaelidis at the initial vandalism call and immediately after the use of force..

Finally, Plaintiffs assert no facts which would support state law claims for battery, negligence, and violation of Cal. Civil Code § 52.1, nor have they adduced facts that remove this incident outside California's broad statutory immunity scheme.

Because Plaintiffs have failed to carry their burden demonstrating, through admissible evidence, that they are entitled to relief on any of their claims, Defendant Officer Morales' motion for summary judgment or, alternatively, partial summary judgment should be granted.  Fed. R. Civ. P. 56.

## II. STATEMENT OF FACTS

### A. Response to Initial Vandalism Incident

Around 3:21 p.m. on October 31, 2021, Vartan Stambulyan called 911 to report that Michaelidis (his tenant) located at 6459 Matilija Avenue had locked himself inside the unit and was causing himself bodily harm, damaging property, was most likely on some type of narcotic, and had access to kitchen knives. Defendant Officer Morales' Statement of Uncontroverted Facts ("UF") 1. At 3:27

2

p.m. on October 31, 2021, LAPD Van Nuys Division Officers Morales, Benavides, Burecu, McComas, Garcia, Castillo, Dreher, Madrigal, and Sergeant Balgemino responded to a radio call of a vandalism suspect at 6459 Matilija Avenue. UF 2.

At 3:31 p.m., Officer Morales arrived at 6459 Matilija Avenue and spoke with Stambulyan who reported the following: Michaelidis left the water and gas on, said he was going to blow up the house, broke the sliding glass door and window, his hands were bloody, he was trying to hurt himself and was on some type of drug, and he had access to knives. UF 3. Officer Morales relayed to Officers Burecu and McComas that Stambulyan was willing to press charges for vandalism and that Michaelidis was heavily under the influence of an unknown substance. UF 4. Upon the officers' arrival, they attempted to communicate with Michaelidis for more than 40 minutes from outside his residence. UF 5. Los Angeles Fire Department (LAFD) and paramedics arrived at 6459 Matilija Avenue to provide medical treatment but Michaelidis would not come out of his residence. UF 6.

To de-escalate the incident and gain compliance, the officers allowed a family member to speak to Michaelidis from outside the residence. UF 7. Michaelidis threw objects out the window, causing the family member and officers to retreat away from the window. UF 8. Because Michaelidis refused to voluntarily come out of the residence to receive medical aid, all the officers were instructed to tactically disengage from the location and end contact. UF 9.

**B.    911 Calls Regarding Michaelidis Armed with Knives**

At 5:07 p.m., Stambulyan called 911 again to report that Michaelidis exited his residence armed with two knives and was walking southbound on Matilija Avenue. UF 10.  At 5:09 p.m., Michaelidis used a knife to slash the tires on two cars parked in the area and then stopped a driver going north on Matilija Avenue by stabbing the car's hood. UF 11. At 5:10 p.m., William Ramos called 911 to report a "guy with a knife popping tires" and "coming up to people" on Victory and Matilija. UF 12. At 5:11 p.m., another neighbor called 911 to report a man running up and

3

1  down the street on Matilija with a "bloody" knife.  UF 13. At 5:12 p.m., Vartan

2  Stambulyan informed LAPD that Michaelidis had two knives in his hands and was

3  stabbing cars on Matilija Avenue south of Victory Boulevard. UF 14.

4        **C.**   **Officer Morales Requested Less-Lethal Options**

5       The responding officers' Digital In-Car Video Systems (DICVS) and their

6  Body Worn Video (BWV) record the officers' encounter with Michaelidis on

7  Victory Boulevard. UF 15. At approximately 5:14 p.m., Officers Morales,

8  Benavides, Mattamira, Alvarez, Garcia, Castillo, Burecu and McComas come across

9  Michaelidis who is holding a knife in each hand and standing in the middle of

10  Victory Boulevard near Matilija Avenue. UF 16. Michaelidis appeared bloody and

11  was holding one knife about 13 inches in length and another knife blade about 9.5

12  inches in length. UF 17. At 5:14 p.m., Officers Benavides and Morales arrived at the

13  scene and positioned their police vehicle along the driver's side of Officer

14  Mattamira's police car; Officers Garcia and Castillo positioned their police car

15  along the passenger side. UF 18.

16       When Officer Morales arrived at the scene, he observed Michaelidis walking

17  towards Officers Mattamira and Alvarez. UF 19. Officer Morales immediately told

18  Officer Mattamira, who had her gun unholstered and pointed at Michaelidis, to "get

19  a 40, get a 40, get a 40, get a 40."  UF 20. As Officer Mattamira grabbed her 40mm

20  Less Lethal Launcher ("40mm LLL"), Officer Morales repeatedly commanded

21  Michaelidis to stop and drop the knife. UF 21. LAPD officers may use the 40mm

22  LLL or the Beanbag Shotgun as a reasonable force option to control a suspect when

23  the **suspect poses an immediate threat to the safety of the officers or others**. UF

24  22. Michaelidis pointed in Officer Morales' direction with his right forefinger, still

25  holding a knife by the handle. UF 23. Officer Morales repeatedly commanded

26  Michaelidis to drop the knife and told him he did not want to hurt him; other officers

27  also repeatedly instructed Michaelidis to drop the knife. UF 24. Officer Morales told

28  Officer Mattamira "if he takes a step, hit him with the 40." UF 25.

4

MANNING | KASS

Officer Morales and the other officers continued repeating commands for Michaelidis to drop the knife. UF 26. Officer Morales then informed the officers, "I got lethal," designating himself as Designated Cover Officer (DCO). UF 27. Michaelidis stood facing the officers holding both knives and pointing back and forth in the officers' direction while the officers continued to repeat their commands for him to drop the knife. UF 28.

Michaelidis refused to drop the knives and pointed at the officers while making unintelligible statements. UF 29. Michaelidis then started walking backwards, and Officer Morales advised the officers, "one person talk" for giving commands. UF 30. Michaelidis walked backwards, placed his palms together and appeared to be praying while holding the knives between his palms with the blades pointed down. UF 31. Michaelidis then dropped the knife in his right hand but held the remaining knife at his chest. UF 32. Officer Morales stated, "One down, he has another one in his hand." UF 33. Officer Castillo attempted to communicate with Michaelidis, who appeared to understand English, but he was not complying with her commands that he drop the other knife. UF 34.

Michaelidis dropped to his knees, still holding the other knife. Officer Castillo continued to order him to drop the knife. UF 35. Michaelidis, while on his knees and holding a knife in his right hand, pointed at his left wrist and repeatedly asked, "What time?" UF 36. Officer Morales requested "get an RA [Rescue Ambulance] to standby" as Michaelidis stayed on his knees. UF 37. Officer Morales told Michaelidis "We got help on the way," and Michaelidis is heard saying "Amen". UF 38.

### D.    Michaelidis Posed an Immediate Threat

Michaelidis then pointed his right forefinger in the officers' direction, going back and forth, and stood up from kneeling on the ground. UF 39. Michaelidis took three steps towards the officers, still holding a knife in his right hand. UF 40. He used his right hand to point at each of the officers as he counted them aloud in

5

English. UF 41. During Officer Morales' initial encounter with Michaelidis at the residence, Michaelidis responded to the officers in English; Officer Morales believed Michaelidis understood basic English. UF 42.

Michaelidis then took several steps back and to his left, transferred the knife to his left hand and with his right hand made a cross-body motion by pointing to his head, to his abdomen, and then from his left shoulder to his right shoulder just below his neckline. UF 43. Officer Morales perceived Michaelidis' gesture as a slit-your-neck type of motion. UF 44. As Michaelidis advanced, he used his right hand to point at Officer Castillo while the knife was in his left hand. UF 45. Officer Morales yelled, "Hey, stop right there! Don't do it," but Michaelidis did not comply and kept advancing towards the officers while holding the knife in his left hand and pointing at the officers in front of him with his right hand. UF 46.

Officer Morales believed the other officers with less lethal force options would use less lethal force to stop Michaelidis from advancing any further as he took his first, second, third, fourth and fifth steps towards Officers Castillo, Garcia, and Alvarez, closing the distance between them. UF 47. Officer Morales believed that the other officers would deploy less lethal options to stop Michaelidis from advancing. UF 48.

As Michaelidis took his sixth step toward Officers Castillo, Garcia, and Alvarez, four officers used force nearly simultaneously to stop Michaelidis from advancing any further. UF 49. Officer Morales' decision to use lethal force was based on the fact that the other officers did not use their less lethal force options earlier to stop Michaelidis from advancing any further, and thus, Michaelidis posed an immediate threat to Officers Castillo, Garcia, and Alvarez by continuing to close the distance between them and refusing commands to stop. UF 50.

Officer Mattamira perceiving Michaelidis as an immediate threat discharged her 40 mm LLL, which is what she had in hand at that time. UF 51. Officer Castillo perceiving Michaelidis as an immediate threat discharged her beanbag shotgun,

6

which is what she had in hand at that time. UF 52. Officer Morales estimated that Michaelidis came within 10 feet of Officer Castillo before he fired one round from his handgun at Michaelidis' center mass, followed by a second round fired at the same area. UF 53. Officer McComas perceiving Michaelidis as an immediate threat discharged his 40mm LLL, which is what he had in hand at that time. UF 54. After being struck by lethal and less-lethal munitions, Michaelidis stopped advancing and fell to the ground. UF 55. Officers Garcia, Castillo, Alvarez, Mattamira, and McComas immediately formed an arrest team and approached Michaelidis. UF 56.

After Michaelidis was handcuffed, officers began rendering medical aid, including CPR, until they were relieved by LAFD. UF 57. Toxicology evidence demonstrates that Michaelidis had Methamphetamine in his system at the time of the incident. UF 58.

## III.   **LEGAL STANDARD**

Summary judgment is appropriate when the moving party establishes by admissible trial evidence that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party has the initial burden of production to establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party may satisfy its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.*, at 325. Only genuine disputes over facts that may affect the outcome of the lawsuit will properly preclude entry of summary judgment. *Anderson*, 477 U.S. at 248.

Moreover, a summary motion is properly granted where there is video recording of the incident from which no reasonable jury could find that a defendant used an unreasonable amount of force. *Scott*, 550 U.S. at 380.

7

**MANNING | KASS**

## IV.  PLAINTIFFS CANNOT CARRY THEIR BURDEN OF ESTABLISHING ANY VIABLE FEDERAL CLAIM

### A.    Michaelidis Posed an Immediate Threat

The uncontroverted evidence, which includes recorded 911 calls, video surveillance, the officers' BWV and DICVS from a police car, show the following:

- At 3:31 p.m., Officer Morales arrived at 6459 Matilija Avenue and learned from Vartan Stambulyan that Michaelidis locked himself inside the unit, was trying to hurt himself, said he was going to blow up the house, was on some type of drug, and had access to knives. UF 4.

- Between 5:07 p.m. to 5:11 p.m., at least three individuals called 911 to report Michaelidis roaming around with bloody knives, stabbing tires and a moving car. UF 10-14.

- At 5:14 p.m., Officer Morales observed Michaelidis walking towards Officers Mattamira and Alvarez, Officer Morales immediately told Officer Mattamira, who had her gun unholstered and pointed at Michaelidis, to "*get a 40, get a 40, get a 40, get a 40.*" UF 15-20.

- Michaelidis refused to comply with the officers' repeated commands to drop the knives. UF 22-24. Officer Morales told Officer Mattamira "*if he takes a step, hit him with the 40.*" UF 25. At one point, Michaelidis went down on his knees and Officer Morales instructed, "*get an RA [Rescue Ambulance] to standby.*" UF 37.

- After Michaelidis stood up from kneeling, he transferred the knife blade to his left hand and started advancing toward the officers. Officer Morales yelled, "*Hey, stop right there! Don't do it,*" but Michaelidis did not comply. UF 43-46.

- The other officers did not use less-lethal force to stop Michaelidis from advancing as he took his first, second, third, fourth and fifth steps towards Officers Castillo, Garcia, and Alvarez. UF 47.

- When Michaelidis took his sixth step toward Officers Castillo, Garcia, and Alvarez, Officer Morales perceived Michaelidis to be an immediate threat and used lethal force to stop him from advancing any further. Officers Mattamira, Castillo and McComas also deployed less-lethal munitions nearly simultaneously.

At minimum, Michaelidis committed crimes under Cal. Pen. Code § 594 (vandalism), Cal. Pen. Code § 415 (disturbing the peace), and Cal. Pen. Code § 417(a) (brandishing of a deadly weapon)[2]. Michaelidis went from vandalizing his

---

[2] *See also, e.g., Estate of Hernandez v. City of Los Angeles*, 2021 U.S. Dist. LEXIS

**Defendant Officer Morales' Notice of Motion and Motion for Summary Judgment or, Alternatively, Partial Summary Judgment**

own rental unit to stabbing tires and a moving car with two bloody knives. UF 11. 911 calls from *three* different witnesses underscored the urgent need for police officers to detain an armed, unpredictable suspect. Under the totality of the circumstances, Officer Morales reasonably construed Michaelidis' acts to constitute serious criminal conduct, and the fact that Michaelidis refused to drop the knife while purposefully advancing towards the officers made him an immediate threat to the officers' safety.

### B.    Officer Morales' Use of Force was Objectively Reasonable

The use of force must be analyzed under the Fourth Amendment and its "reasonableness" standard. *Smith v. City of Hemet*, 394 F.3d 689, 700 (9th Cir. 2005); *see also Graham*, 490 U.S. at 395. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*, at 396-397. The inquiry is an objective one: "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id*., at 396. Moreover, "[t]he Constitution is not blind to the fact that police officers are often forced to make split-second judgments." *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775 (2015).

"To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014). Thus, any calculus of reasonableness must embody allowance for the fact that officers must make these split-second judgments "in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396-397; *see also Ryburn v. Huff*, 132 S. Ct. 987, 991-992 (2012). "A reasonable use of deadly force encompasses a range of conduct, and **the availability of a less intrusive**

155185 at *9 (C.D. Cal. Aug. 2, 2021).

**alternative will not render conduct unreasonable**." *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010)(Emphasis added).

An officer is justified in using deadly force where a suspect threatens officers with a weapon. *Smith*, 394 F.3d at 704 ("where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force"). Established precedent regarding an officer's use of force in response to knife-wielding citizens demonstrate the reasonableness of Officer Morales' actions in this case. *See, e.g., R.E. v. City of Long Beach*, 2022 U.S. Dist. LEXIS 118125 (C.D. Cal. July 5, 2022) (Court granted summary judgment on all of plaintiffs' federal and state law claims stemming from lethal force used on erratic suspect wielding knife on freeway threatening to harm himself.); and *Estate of Hernandez v. City of Los Angeles*, 2021 U.S. Dist. LEXIS 155185 (Court granted summary judgment on all of plaintiffs' federal and state law claims stemming from lethal force used on drug-influenced suspect wielding knife on officer after being involved in a traffic collision.)

Officer Morales' actions were similarly objectively reasonable, particularly as Officer Morales was informed that Michaelidis was "heavily under the influence of an unknown substance." This information combined with Michaelidis refusing to comply with commands to drop the knife and continuing to close the distance, indicated to Officer Morales that Michaelidis posed an immediate threat. In *Estate of Hernandez v. City of Los Angeles*, Hernandez – like Michaelidis – brandished a knife, advanced quickly towards an officer who said "drop the knife", before being fatally shot. The *Hernandez* Court found:

> Indeed, the Ninth Circuit has rejected this distance-related argument, finding that a suspect who is 55 feet away can still pose an imminent threat because he can cover the distance in matter of seconds. *See Watkins v. City of San Jose*, No. 15-CV-05786-LHK, 2017 U.S. Dist. LEXIS 68648, 2017 WL 1739159, at *10 (N.D. Cal. May 4, 2017), aff'd sub nom. *Buchanan v. City of San Jose*, 782 F. App'x 589 (9th Cir.

10

**Defendant Officer Morales' Notice of Motion and Motion for Summary Judgment or, Alternatively, Partial Summary Judgment**

2019) ("Although the officers may have been in more danger if the officers had waited for Decedent to advance closer to the officers, the pace of Decedent's advance and his failure to follow direct commands to drop the knife and get on the ground indicate that the officers had probable cause to believe that the suspect pose[d] a significant threat of death or serious physical injury to the officer[s].") (citation omitted). *Id.*, at 12-13.

The facts in *Blanford v. Sacramento County*, 406 F.3d 1110 (9th Cir. 2005) are also instructive. In *Blanford*, officers were called to investigate calls of a man (later identified as Blanford) walking down the street wearing a ski mask and brandishing a civil war era sword. *Id.*, at 1112. The officers saw Blanford and yelled to have the man drop the sword, but the man never responded. *Id.*, at 1112-13. The officers continued to follow Blanford as he approached a home and tried to enter it. *Id.*, at 1113. When Blanford ignored the officers' commands, the officers fired at Blanford until he fell to the ground. *Id.*, at 1113-14.

In granting summary judgment, the Court concluded that from the perspective of a reasonable officer, "the deputies had cause to believe that Blanford posed a serious danger to themselves and to anyone in the house or yard that he was intent upon accessing, *because he failed to heed warnings or commands and was armed with an edged weapon that he refused to put down*." *Id.*, at 1116. (Italics added.)

Officer Morales' actions were likewise objectively reasonable, as Michaelidis was clearly a threat to the officers and the public. Officer Morales was not expected to allow Michaelidis to get within arms-length of stabbing an officer before stopping him. *Wilkinson*, 610 F.3d at 551.

The reasonableness of the use of force turns largely on whether the officer reasonably believed that a suspect posed an immediate threat to the safety of the officer or others. *See Smith*, 394 F.3d at 702; *Isayeva v. SacSheriff's Dept.*, 872 F.3d 938, 947 (9th Cir. 2017). Deadly force is reasonable where probable cause exists to believe the suspect poses a significant threat of death or serious injury. *Tennessee v.*

1  *Garner*, 471 U.S. 1, 3 (1985). If the officers used deadly force while the suspect

2  posed an immediate threat of death or serious bodily harm to the officers or others,

3  there was no violation of the suspect's rights under 42 U.S.C. § 1983. *Graham*, at

4  388, 396.

5       Any officer in Officer Morales' position would reasonably conclude that

6  when Michaelidis advanced toward the officers, brandishing a knife and ignoring

7  commands, he posed an immediate threat.  This is further supported by the fact that

8  Officers Mattamira and McComas both discharged their 40mm LLLs and Officer

9  Castillo discharged her beanbag shotgun nearly simultaneously.  All four officers

10  believed Michaelidis posed an immediate threat and acted to stop the threat by using

11  the force option immediately available to them at the time the threat was perceived.

12  To transition to another force option would have created a potential deadly delay for

13  the officers. Officer Morales was required to make a split-second judgment in this

14  "tense, uncertain, and rapidly evolving" situation where an individual, acting

15  erratically, was aggressively advancing toward his fellow officers, ignoring

16  commands to drop the knife. Under these facts, the force was reasonable.

17       **C.**     **Officer Morales is Entitled to Qualified Immunity**

18       Although Officer Morales' actions were objectively reasonable, he is further

19  protected by the qualified immunity doctrine and similar state law immunities.

20  Qualified immunity shields government officials from liability insofar as their

21  conduct does not violate clearly established statutory or constitutional rights of

22  which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800,

23  818 (1982). In analyzing whether qualified immunity applies, a Court must address

24  two questions: (1) did the defendant's conduct violate a constitutional right, and (2)

25  was the right at issue clearly established, such that a reasonable officer would have

26  understood his conduct to be improper. *Scott*, 550 U.S. at 377 (citation omitted).

27       To be clearly established, a right must be sufficiently clear that every

28  reasonable official who violates that right would have understood that his conduct

was unlawful. *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015). There need not be a case directly on point, but existing precedent must place the statutory or constitutional question "beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731 (2011). "Clearly established law" is not to be defined at a high level of generality, for qualified immunity is no immunity at all if "clearly established law" can simply be defined as "the right to be free from unreasonable searches and seizures." *Sheehan*, 135 S. Ct. at 1775-76.

The relevant inquiry on qualified immunity is whether it would have been clear to a reasonable officer that his conduct was unlawful. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)(citation omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *al-Kidd*, 131 S. Ct. at 2085. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It is plaintiff's burden to prove that the right allegedly violated was clearly established at the time. *Davis v. Scherer*, 468 U.S. 183, 197 (1984).

"[T]he clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). "This Court has repeatedly told courts . . . not to define clearly established law at a high level of generality." *Id.*, citing *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Emmons*, 139 S. Ct. at 503, quoting *Kisela*, 138 S. Ct. at 1152-1153.

Although there are no cases that squarely govern the specific facts of this case (which by itself confirms Officer Morales' entitlement to qualified immunity), *Kisela* and *Sheehan* provide guidance.

In *Kisela*, officers responded to a call that a woman was hacking a tree with a

13

large kitchen knife. *Kisela*, at 1151. While Chadwick was talking to the officers, Hughes then came out of the house, brandishing a large kitchen knife. *Id*. Hughes did not drop the knife or even acknowledge the officers' presence. *Id*. Concerned for Chadwick, one of the officers (Kisela) then fired four times at Hughes through the fence. *Id.*

Without considering whether the officer's actions were unlawful, the Supreme Court found that the officer was nonetheless entitled to qualified immunity. In reversing the Ninth Circuit, the Supreme Court noted that "the most analogous Circuit precedent favors Kisela," citing to *Blanford*. *Id*., at 1153. The High Court went on to state that based on the decision in *Blanford* and the great similarities in fact between the cases, "a reasonable officer could have believed [that the use of deadly force did not violate the Fourth Amendment] was true in the instant case." As several cases, including *Blanford* and *Kisela* depict similar facts, where there was no violation of rights found, it was reasonable for Officer Morales to conclude that his actions were similarly lawful.

In *Sheehan*, officers were called to a group home where a resident (Sheehan) began acting erratically and threatened to kill her social worker and closed herself in her room. *Sheehan*, at 1770. Upon arrival, the officers entered Sheehan's room, where Sheehan immediately grabbed a knife and threatened to kill the officers. *Id*. The officers retreated and closed the door again to re-assess the situation. *Id*., at 1770-71. Concerned that Sheehan could escape and harm someone else, the officers re-entered the room and used pepper spray to try and subdue Sheehan. *Id*., at 1771. When that proved ineffective, the officers then shot Sheehan multiple times. *Id*. Both the Ninth Circuit and Supreme Court agreed that the officers' use of force in entering Sheehan's room the second time was reasonable. *Sheehan*, at 1775.

Even if judged in hindsight and had Officer Morales made a mistake or misjudged the actual threat that Michaelidis posed, he is nonetheless entitled to qualified immunity. Significantly, there is no case law squarely governing the facts

14

of this case to indicate that Officer Morales' actions were unlawful. Conversely, as demonstrated in *Blanford*, *Kisela* and *Sheehan*, Officer Morales could have undoubtedly concluded his actions were lawful; at the time he made the split-second decision to use lethal force, the other officers had not yet deployed less lethal-force to stop Michaelidis from getting any closer. Thus, Officer Morales reasonably believed he *had to act* to stop Michaelidis from potentially knifing an officer.[3]

### D.    Plaintiffs' Denial of Medical Care Claim is Without Merit

Officers must seek the necessary medical attention for a detainee when he or she has been injured <u>while being apprehended</u> by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital. *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1098 (9th Cir. 2006) (holding that a police officer who promptly summons the necessary medical assistance by requesting an ambulance acted reasonably for purposes of the Fourth Amendment). An officer is not required to provide what hindsight reveals to be the most effective medical care for an arrested suspect. *Id*., at 1098. An officer's duty to provide medical care to a suspect can be fulfilled by promptly summoning the necessary medical help. *Maddox v. Los Angeles*, 792 F.2d 1408, 1414-15 (9th Cir. 1986)(citation omitted).

The uncontroverted facts establish that Michaelidis was provided medical aid and emergency medical personnel were immediately requested to respond after the use of force incident. LAFD personnel were also waiting at Michaelidis' residence during the initial vandalism incident to provide him medical treatment, but Michaelidis <u>refused to exit his residence</u>. Michaelidis was not under arrest when he locked himself inside his rental unit, and the Constitution did not require Officer Morales to force an unwilling person to receive medical treatment. Accordingly,

---

[3] *See R.E. v. City of Long Beach*, 2022 U.S. Dist. LEXIS 118125 at *13 and *Estate of Hernandez v. City of Los Angeles*, 2021 U.S. Dist. LEXIS 155185 at *13, citing *Buchanan v. City of San Jose*, 782 F. App'x 589, 592 (9th Cir. 2019) (unpublished).

MANNING | KASS

1   Plaintiffs have no claim for denial of medical care against Officer Morales.

2   **E.    Plaintiffs' Claim for Denial of Familial Relationship also Fails**

3       To prove their claim for violation of their Fourteenth Amendment rights,

4   Plaintiffs, particularly Plaintiff Vardoui Michaelidou, have to prove that: (1) that the

5   parent had assumed parental responsibility by daily parental association or by

6   consistent contact that demonstrates participation in and responsibility for the daily

7   activities of the child; (2) that the conduct of Officer Morales "shocks the

8   conscience" by acting with a purpose to harm unrelated to legitimate law

9   enforcement objectives; and (3) that the conduct of Officer Morales was the cause of

10  Micaehelidis' death.  *Wilkinson v. Torres*, 601 F.3d 546, 554 (9th Cir. 2010); Porter v.

11  Osborne, 546 F.3d 1131, 1136-37 (9th Cir. 2008); *Moreland v. Las Vegas Met.*

12  *Police Dept,* 159 F.3d 365, 372-72 (9th Cir. 1998); *Wheeler v. City of Santa Clara*,

13  894 F.3d 1046 (9th Cir. 2018); *Lewis v. Sacramento County*, 98 F.3d 434, 441 (9th

14  Cir. 1996); *Byrd v. Guess*, 137 F.3d 1126, 1134 (9th Cir. 1998).

15      The courts have held that biology alone is not sufficient to establish a

16  Fourteenth Amendment familial relationship claim.  The Fourteenth Amendment

17  requires that there was a consistent involvement and enduring relationship between

18  the parent and child and that there was "emotional attachments that derive[d] from

19  the intimacy of daily association".  *Wheeler*, *supra*, 894 F.3d at 1057-59.

20      Further, a claim against an officer for substantive due process rights under the

21  Fourteenth Amendment considers the subjective intent of the officer. *A. D. v. State*

22  *of Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2012). In circumstances with

23  "constant flux" that require officers to make "snap judgments", substantive due

24  process violations exist only when the officer "shocks the conscience" or intends to

25  "harm, terrorize or kill" the suspect without a legitimate law enforcement objective.

26  *Porter v. Osborn*, 546 F.3d 1131, 1140-1141 (9th Cir. 2008). "Legitimate law

27  enforcement objectives [include] arrest, self-defense, or the defense of others."

28  *Fewell v. California*, 2017 WL 6043080, at *6 (C.D. Cal. Apr. 11, 2017). Summary

16

judgment for the officer is appropriate when there is no evidence of an ulterior motive. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 798-799 (9th Cir. 2014).

Officer Morales' use of force was solely motivated by the need to protect the officers. *Gonzalez*, 747 F.3d at 798. The fact that Officer Morales instructed another officer to use less lethal to stop Michaelidis is proof that Officer Morales did not intend to use lethal force unless and until Michaelidis posed an immediate threat. There is no substantive due process violation under these circumstances. UF 20, 25.

Michaelidou, Michaelidis' mother who lives in Greece, who is not the heir or success-or-interest to Michaelidis, may only assert any claims in this case by demonstration of a relationship entitling her to relief under the Fourteenth Amendment. Plaintiff cannot meet that burden. Michaelidou had not lived with her son since 2001. UF 63. Between 2014 and 2021, Michaelidou saw Michaelidis only twice in-person, once in 2016 and once in 2018. UF 63. The last time Michaelidou spoke to Michaelidis was more than a week prior to October 31, 2021. UF 63. And, Michaelidou did not receive any financial support from Micahelidis, and she did not provide him with any financial support. UF 64. Thus, there was no intimate daily parental association or consistent contact in a manner that demonstrated a parental responsibility or an "enduring relationship" between them.

## V.   PLAINTIFFS' STATE LAW CLAIMS SHOULD ALSO BE DISMISSED

### A.   Plaintiffs' Battery Claim Fails

A battery claim is a state law counterpart to a federal 42 U.S.C. section 1983 claim of excessive use of force because, in both, a plaintiff must prove that the peace officer's use of force was unreasonable. *Munoz v. City of Union City*, 120 Cal.App.4th 1077, 1102 (2004); *Brown v. Ransweiler*, 171 Cal.App.4th 516, 526-28 (2009). If conduct is objectively reasonable so as to defeat a federal section 1983 claim, said conduct also defeats a state law claim of battery. An officer is not similarly situated to the ordinary battery defendant, rather, he is entitled to use even

1  greater force than might be in the same circumstances required for self-defense.

2  *Brown*, 171 Cal.App.4th at 527.

3       Officer Morales is not liable for battery if his actions were objectively

4  reasonable based on the facts and circumstances confronting him, a test highly

5  deferential to an officer's need to protect himself and others. *Id*., at 527-528.

6  Michaelidis escalated his conduct from vandalizing his own rental unit to roaming

7  the public streets armed with two knives. When Michaelidis advanced toward the

8  officers, ignoring repeated commands, Officer Morales' actions in stopping the

9  threat were not only reasonable, they were necessary to protect the officers.

10       **B.**    **Plaintiffs' Negligence Claim also Fails**

11       "[I]n order to prove facts sufficient to support a finding of negligence, a

12  plaintiff must show that [the] defendant had a duty to use due care, that he breached

13  that duty, and that the breach was the proximate or legal cause of the resulting

14  injury." *Hayes v. County of San Diego*, 57 Cal.4th 622, 629 (2013)(citation

15  omitted).The California Supreme Court "has long recognized that peace officers

16  have a duty to act reasonably when using deadly force." *Hayes*, 57 Cal.4th at 629.

17  As the Court explained, "[t]he reasonableness of an officer's conduct is determined

18  in light of the totality of circumstances." *Id*., at 629-630. Officers are afforded

19  discretion in performing their duties. *Id.,* at 632.

20       Police officers act under color of law to protect the public interest and are

21  charged with acting affirmatively and using force as part of their duties, because

22  "the right to make an arrest or investigatory stop necessarily carries with it the right

23  to use some degree of physical coercion or threat thereof to effect it." *Munoz*, 120

24  Cal.App.4th at 1109. Thus, "an officer may reasonably use deadly force when he or

25  she confronts an armed suspect in close proximity whose actions indicate an intent

26  to attack." *Id*., at 1102.

27       The test for determining whether a homicide was justifiable under Cal. Penal

28  Code § 196 "is whether the circumstances 'reasonably create[d] a fear of death or

18

1  serious bodily harm to the officer or to another.'" *Brown*, 171 Cal.App.4th at 533.

2  While police officers have a duty to act reasonably when using deadly force, they

3  are still authorized to employ such force where necessary and appropriate. *Hayes,* 57

4  Cal.4th at 629. In determining whether an officer breached the duty of care,

5  California courts apply the same standards applicable in federal cases. Accordingly,

6  the "'reasonableness' of a particular use of force must be judged from the

7  perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

8  hindsight." *Id.,* at 632, citing *Graham*, 490 U.S. at 396. The reasonableness standard

9  in state court also affords officers discretion to accommodate the difficulty of their

10 task. *Id*. As stated above, Officer Morales acted reasonably given how the situation

11 evolved. Initially, Michaelidis was breaking items in his own rental unit and

12 refusing to come out. Michaelidis later exits his residence armed with two large

13 knives wreaking havoc, prompting scared neighbors to call 911.

14     Further, Officer Morales' actions are immune from liability under California

15 Government Code §§ 820.2, 821.6 and 845.8. Under section 820.2, although Officer

16 Morales' actions were reasonable, they were also discretionary such that he cannot

17 be held liable for his discretionary use of force to subdue Michaelidis. *Hayes*, 57

18 Cal.4th at 632. Under section 821.6, Officer Morales is entitled to immunity to the

19 extent that his knowledge or investigation into the subject incident was in any way

20 negligent. *See, e.g., Amylou R. v. Cnty of Riverside*, 28 Cal.App.4th 1205, 1209-

21 1210 (1994). Officer Morales' actions are also immune under section 845.8. *See*

22 *Hooper v. City of Chula Vista*, 212 Cal.App.3d 442, 453-54 (1989) (applying

23 section 845.8 to the claims of a fatally injured subject resisting arrest).

24     **C.     Plaintiffs' Bane Act Claim Fails as a Matter of Law**

25     "The essence of a Bane Act claim is that the defendant, by the specified

26 improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the

27 plaintiff from doing something he or she had the right to do under the law or to force

28 the plaintiff to do something that he or she was not required to do under the law."

19

1  *Shoyoye v. Cnty. of Los Angeles*, 203 Cal.App.4th 947, 955-956 (2012).

2       To establish a claim under California Civil Code § 52.1(b), a plaintiff must

3  allege facts showing that defendants attempted or did interfere with plaintiff's state

4  or federal constitutional rights by threatening or committing violent acts. *Austin B.*

5  *Escondido Union School District*, 149 Cal.App.4th 860 (2007). There must be

6  allegations and evidence that Defendants threatened, intimidated or coerced

7  Michaelidis. *Jones v. Kmart Corp.*, 17 Cal.4th 329, 334 (1998) (characterizing §

8  52.1 as requiring "interference with a legal right, accompanied by a form of

9  coercion").

10      As confirmed by the California Supreme Court in *Venegas v. County of Los*

11  *Angeles*, 32 Cal.4th 820 (2004), the Bane Act "does not extend to all ordinary tort

12  actions because its provisions are limited to threats, intimidation, or coercion that

13  interferes with a constitutional or statutory right." *Id.*, at 843. The Court also

14  confirmed that a plaintiff asserting a claim for violation of the Bane Act is required

15  to further plead and prove that the alleged constitutional violation was

16  "accompanied by the requisite threats, intimidation, or coercion." *Id.* In *Cornell v.*

17  *City and County of San Francisco*, 17 Cal.App.5th 766 (2017), the California Court

18  of Appeal explained that "the egregiousness required by Section 52.1 is tested by

19  whether the circumstances indicate the [person] had a **specific intent** to violate the

20  [plaintiff's] right." *Id.*, at 801-802 (emphasis added); *see also*, *Lyall v. City of Los*

21  *Angeles*, 807 F.3d 1178, 1196 (9th Cir. 2015) (Bane Act violation requires

22  allegations of threats, coercion, or intimidation beyond the coercion inherent in the

23  conduct that forms the basis of the plaintiff's Section 1983 claim).

24      In *Reese v. County of Sacramento*, 888 F.3d 1030, 1044-45 (9th Cir. 2018),

25  the Ninth Circuit determined that because the objective reasonableness test (citing

26  *Graham*) does not consider the officer's underlying intent or motivation, an

27  excessive force violation of the Bane Act requires that "the defendants 'intended not

28  only the force, but its unreasonableness, its character as 'more than necessary under

20

MANNING | KASS

1  the circumstances.'" *Id.* at 1045.  Evidence simply showing the officer's conduct

2  amounted to a constitutional violation under an objectively reasonable standard is

3  insufficient. *Id.,* at 1045.

4        Officer Morales did not interfere with Michaelidis' legal rights by the use of

5  threats, intimidation or coercion. Officer Morales' actions were entirely reasonable

6  as his sole intention in using force was to protect officers from an advancing, non-

7  compliant suspect wielding a knife. Plaintiffs' Bane Act claim fails as a matter of

8  law.

9                                    * * *

10        Plaintiffs have failed to demonstrate a viable state claim. However, if this

11  Court concludes that Plaintiffs have demonstrated an issue of fact, Officer Morales

12  requests that this Court exercise supplemental jurisdiction over those claims in the

13  interest of efficiency and judicial economy.  *Satey v. JPMorgan*, 521 F.3d 1087,

14  1090-91 (9th Cir. 2008).

15  **VI.   CONCLUSION**

16        The use of lethal force by Officer Morales was not only objectively

17  reasonable, but was absolutely necessary to protect the officers from Michaelidis.

18  Accordingly, Officer Morales respectfully requests his Motion for Summary

19  Judgment be granted in its entirety.

20  DATED:  June 16, 2023          **MANNING & KASS**

21                                 **ELLROD, RAMIREZ, TRESTER LLP**

22

23

24                                 By:  _____/s/ Kayleigh A. Andersen_____

24                                     Eugene P. Ramirez

25                                     Kayleigh A. Andersen

26                                     Attorneys for Defendant, BRYAN

26                                     MORALES

27

28

**L.R. 11-6.2. Certificate of Compliance**

The undersigned, counsel of record for Defendant OFFICER BRYAN MORALES certifies that this brief contains **6978** words, which complies with the word limit of L.R. 11-6.1.

DATED:  June 16, 2023

**MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP**

By:    /s/ Kayleigh A. Andersen
Eugene P. Ramirez
Kayleigh A. Andersen
Attorneys for Defendant, BRYAN MORALES

Defendant Officer Morales' Notice of Motion and Motion for Summary Judgment or, Alternatively, Partial Summary Judgment