# EXHIBIT A

June 23, 2023

Kayleigh Andersen, Esq
Eugene Ramirez, Esq
Manning | Kass
801 S. Figueroa Street, 15th Floor
Los Angeles, CA 90017

### Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**ANGELINA ATABECKOVA-MICHAELIDIS and VARDOUI MICHAELIDOU, both individually and as successors in interest to Decedent MELKON MICHAELIDIS, Plaintiffs,**

**Vs.**

**THE CITY OF LOS ANGELES; BRYAN MORALES, and DOES 1-10, INCLUSIVE, Defendants,**

**USDC Case No. 2:22-cv-05620-MCS-MAAx**

Ms. Anderson, Mr. Ramirez:

Thank you for retaining me to review, examine, and render opinions on this matter.  I have studied and analyzed interviews, policies, and procedures, video, and audio recordings, reports, photographs, memorandums, and associated material (listed in the Materials Reviewed Section of the Federal Rules of Civil Procedures 26 (a) (2) (B) report) provided thus far in this case.

I understand that this matter is still evolving.  If you provide additional documents, data, or materials to review, I may need to author a supplemental report to underscore current or express other opinions.  Also, it's important to note that I am not making credibility determinations when identifying my opinions or conclusions.

Phillip L. Sanchez

## EXPERT REPORT OF PHILLIP L. SANCHEZ

My name is Phillip L. Sanchez, and I authored this report at the request of defense counsel Kayleigh Andersen, Esq, and Eugene Ramirez, Esq.

I was a peace officer in California for 38 years serving with the Santa Monica and the Pasadena Police Departments.  My career included numerous assignments as a police officer, field training officer, investigator, task force liaison officer, Sergeant, lieutenant, captain, deputy chief, interim police chief, and chief of police.

I attended the Rio Hondo Police Academy in 1980.  I graduated 3rd overall in my class and was ranked 1st in physical fitness and practical application, including arrest and control tactics.  The Santa Monica Police Department hired me in April 1980.  I served the community for 30 years, rising to deputy chief (the first deputy chief in the department's history).  I also served as interim police chief for the same agency in 2005.

The City of Santa Monica is approximately 9.2 square miles with about 85,000 people.   The city is a popular international destination requiring unique police resources to serve a diverse population.  The City of Santa Monica hosts numerous large-scale events yearly, requiring additional police services, strategic planning, and sometimes mutual aid with other law enforcement agencies.

The Santa Monica Police Department maintained a multi-million-dollar budget and was a full-service municipality during my tenure.  The agency employed approximately 215 sworn peace officers and 200 professional staff and operated a Type 1 jail facility (capacity for 80 inmates, pre-arraignment).  The department provided its employees with various police services, youth programs, and professional development.

As a police officer, I was familiar with the departmental rules, regulations, policies, customs, and practices governing the Santa Monica jail, use of force, and general orders.  I arrested, processed, or had direct contact with hundreds of inmates in a custody environment.  As a peace officer, I conducted field investigations, custody, and witness interviews, collected and processed evidence/property, and participated in numerous major incident scenes.  I served as a patrol officer and field training officer.  I was chosen for the Crime Impact Team, vice/narcotics undercover operator, and investigator before my promotion to police sergeant in 1988.

As a police detective, I investigated numerous criminal matters and presented the cases to the appropriate prosecutor for filing consideration.  I conducted criminal investigations, managed informants, and undercover, covert, and high-risk operations.  I was familiar with investigative strategies and custody protocols (use of the detoxification and safety cells and restraining devices).

I served as a certified firearm (pistol, sub-machine gun, police rifle), defensive tactics, and arrest and control instructor.  I had knowledge and experience in field operators, patrol protocols, mass casualty response, unusual occurrences, canines, and small unit tactics.

As a California peace officer, I qualified as an expert in State Court numerous times, involving undercover operations, narcotics sales, possession for sales, distribution, control, and identifying subjects under the influence of opioids, methamphetamine, phencyclidine, the use of force, SWAT, and patrol tactics.  I served on several professional panels providing expert opinions on various topics, including police-community relations, use of force, officer-involved shootings, administrative and internal affairs investigations, audits and inspections, evidence tracking, and jail operators.  I also managed the department's Emergency Operations Center (EOD) as necessary.

As a police sergeant in the Office of Operations, I was the acting watch commander, patrol, and tactical unit supervisor.  I supervised field investigations, approved arrests, and investigated the use of force incidents and misconduct allegations involving sworn and non-sworn employees.  I led, managed, or participated in warrant service and civil unrest incidents and served as the Officer in Charge (OIC) for the Democratic National Convention hosted in Santa Monica.

I served in the Technical Services Division as an Adjutant.  My duties included supervising the Records Section, Communication Section, and jail and monitoring the department's budget.  As the jail manager, I completed Title 15 and jail operations training for a Type 1 facility.  I was responsible for ensuring the current jail policy, ordering supplies, and ensuring inmate safety.  I authorized medical treatment for inmates, prisoner transportation to local hospitals, the Los Angeles County Central Jail, legal representatives or family visitations, and release from custody, among other duties.

I developed and implemented the Santa Monica Police Department's Metro Crime Unit and the Special Weapons & Tactics Team (SWAT).  The team started with nine operators and later increased to over 30 tactical specialists.  The Metro/SWAT team was responsible for warrant service, high-risk tactical entries, mitigating barricaded suspect situations, and hostage rescue.  The Metro/SWAT team conducted more than 70 incidents annually, including high-risk area searches with the canine unit.  I supervised the department's canine unit, defensive tactics unit, and firearms cadre.  I also developed and implemented the Santa Monica Police Department's Patrol Rifle Team, frequently assisting the SWAT Team with high-risk incidents.

As a police lieutenant, I served as a watch commander and supervised subordinate personnel.  I managed field investigations and approved reports and other official documents.  I conducted audits and investigated use-of-force incidents and misconduct allegations involving sworn and non-sworn employees.

I supervised over 50 sworn and professional staff as the Criminal Investigation Division Executive Officer.  I led complex criminal investigations, approved reports, and conducted high-

profile investigations.  I managed undercover operations involving large amounts of narcotics and U.S. Currency.  I liaised with the Federal Bureau of Investigations-Joint Terrorist Task Force (JTTF), addressing issues associated with homeland security and terrorism.  I also worked closely with the Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force (LA-IMPACT) to mitigate major narcotics distribution.  I investigated misconduct allegations, disciplined employees (as the circumstances warranted), and recommended divisional commendations.  I reported the division's work efforts and crime statistics to my superiors, the Federal Bureau of Investigations (FBI), and the California Attorney General's Office.  I managed the Uniform Code Reporting (UCR) and criminal case management system.

I served as the Jail Administrator and supervised all aspects of jail operations.  I conducted administrative audits and internal affairs investigations and evaluated employees' performance.  I participated in the Title 15 training and directly supervised jail staff, ensuring the department complied with the Board of State Community Corrections (BSCC) and Standards and Training for Corrections (STC) regulations.  I implemented a contemporary use of force and a critical incident evaluation process.  I served as an original member of the department's Liability Assessment Team, responsible for investigating officer-involved shootings, in-custody deaths, and other high-risk incidents.  I commanded the department's Internal Affairs Section, where I managed and conducted administrative investigations, allegations of criminal misconduct, and related incidents.  I implemented an early warning tracking system to monitor officers' and non-sworn employees' performance.  I managed or assisted with investigating officer-involved shootings, categorical use of force, and other sensitive matters reporting my findings directly to the Santa Monica police chief.

As a police captain, I supervised police lieutenants, sergeants, offices, and professional staff assigned to the Operations Division.  My duties included managing the most significant budget within the Santa Monica Police Department, reviewing misconduct allegations, and making policy and discipline recommendations to the police chief.  I also developed deployment strategies, planned for large-scale events in the city, managed civil unrest incidents, monitoring the Field Officer's Training Program and other units assigned to patrol.  I participated in the department's Mutual Aid Program/response, collaborating with local, state, and federal officials.

I served as the Santa Monica Police Department's Jail Administrator and was responsible for developing policy recommendations for the police chief, ensuring compliance with Titles 15 and 24.  I frequently met with representatives from the Board of State Community Corrections and Standards and Training for Corrections concerning training plans, the physical plant (jail), regulatory compliance, and routine audits.  I reviewed employee performance, completed administrative reports, and initiated Internal Affairs investigations.  I served as the Incident Commander when critical events occurred in the jail, including in-custody deaths and the categorical use of force.

As the Santa Monica Police Department's deputy chief, I assumed command of the organization in the absence of the police chief.  I was responsible for the daily operations of the department,

and my subordinates included four (4) police captains, three (3) civilian managers, and twelve (12) lieutenants.  I also supervised the department's Internal Affairs, Jail Operations, special events, and professional standards sections.  I led the department's Internal Affairs and Audit/Inspections Sections and was the liaison for local, state, and federal law enforcement agencies.  I frequently met with jail supervisors concerning employee performance, budget, staffing, scheduling, the physical plant, suicide prevention for inmates, or prisoners requiring special accommodations.  I participated in or initiated jail audits with the Board of State Community Corrections and the Los Angeles County Civil Grand Jury.  I collaborated with local hospitals and nonprofit organizations' professional representatives regarding inmates' medical and mental health services.  I served as the Incident Commander in several high-risk incidents, including the Santa Monica Pier Hostage incident and the Third Street Promenade Mass Casualty Incident.

As deputy chief, I managed several large projects, including the department's transition into the new Public Safety Facility (police headquarters).  The move to the Public Safety Facility involved coordinating logistics, purchasing supplies, the police radio cut-over (transferring communications and telephone lines from the old police building to the Public Safety Facility), identifying workspaces for all four divisions, and ensuring the custody area met BSCC requirements-related issues.  I managed the police technology projects, including the department's communications upgrade (patrol cars, mobile radios, and the base station).  I led the department's effort to purchase less-lethal devices (conductive electronic weapons) and implemented the associated training and governing policies.   I frequently reviewed the use of force policies, practices, and protocols for the entire department, including the jail section.  I managed the department's budget and approved significant acquisitions.

I served as the Santa Monica interim police chief and was responsible for all aspects of the department.  I developed and approved policies, discipline employees, approved budget acquisitions, and worked closely with the city's leadership team (City Manager, City Attorney, and department executives).  I met with the Los Angeles County Police Chiefs and South-Bay Police Chiefs Associations.

I resigned from the Santa Monica Police Department after 30 years of professional service when selected to lead the Pasadena (C.A.) Police Department as chief in July 2010.

The City of Pasadena is approximately 26 square miles and has about 152,000 people.  The city is a popular international destination with iconic historical venues like the Norton Simon and USC Pacific Asian Museums, the Rose Bowl Stadium, the Pasadena Tournament of Roses House, and the Jet Propulsion Laboratory (JPL).  Several prestigious educational institutions are in the city, including Caltech, Fuller Theological University, and Pasadena City College (PCC).  More than 900 nonprofit organizations operate in the city and provide various nongovernmental services, including housing, social services, mental health outreach, and crisis intervention.

Pasadena hosts several major events annually, including the Rose Parade & Rose Bowl Game, NCAA Athletic Events, International Soccer matches, UCLA and PAC 12 Football Games, and iconic entertainers.  The events draw more than a million people to the city yearly, which requires additional police resources and strategic security planning.

As the Pasadena Police Chief, my direct subordinates included the deputy police chief, four police commanders, the Air Support Captain, five civilian commanders, the internal affairs and professional standard unit, and the audit/inspection unit.  I was responsible for more than 383 full-time employees (250 peace officers) and maintained an annual budget of approximately 80 million dollars.  I was responsible for all aspects of the department, public safety, crime reduction, and building community trust.  The police department operated a Type 1 jail facility (capacity for 100 inmates, pre-arraignment).  I frequently inspected the jail and evidence room to ensure compliance with state regulations.

As the chief executive, I approved hiring jail staff and sworn peace officers.  I managed technology enhancements, training, and the purchase of specialized equipment (SCBA, Cameras, PPE, AEDs).  I initiated jail inspections and audited in coordination with the BSCC and the Los Angeles County Civil Grand Jury.  I frequently met with BSCC and STC representatives regarding the department training plans for custody staff and sworn personnel assigned to the jail.

I served as the Incident Commander at all the major events hosted in the city, including those at the Rose Bowl Stadium, Tournament of Roses Parade, International Sporting Events, and Entertainment Events, providing police resources, identifying local and homeland security risks, and working collaboratively with state and federal law enforcement agencies.  I selected Pasadena peace officers to serve with the Federal Joint Terrorism Task Force (JTTF), High-Intensity Drug Traffic Areas (HIDTA), and United States Marshal Services (USMS) as task force officers.  I also worked closely with the United States Secret Service (USSS), United States Military (Marines, Navy – Special Ops, Army – Special Ops, Coast Guard, and Air Force), and other Homeland Security & Defense agencies.  I maintained a high-level security clearance and frequently attended secret briefings by the FBI, DEA, USSS, and other federal agencies.  I identified, implemented, and coordinated security measures with the United States Secret Service during visits from the President of the United States (POTUS), international leaders, or other high-ranking officials.

As the Pasadena Police Chief, I served two terms as the Foothill Air Support Team (FAST) President.  I was responsible for the department's Air Support Program, which maintained a fleet of seven helicopters (3rd largest in Los Angeles County) and provided aerial resources for municipalities in the San Gabriel Valley.  I approved significant acquisitions through the Federal Government's 1033 Program, which offers the opportunity to secure surplus equipment, reducing the department's budget impact.  I also served as the President of the San Gabriel Police Chiefs Association and was an active member of the Los Angeles County Police Chiefs Association.

As police chief, I received notifications regarding all critical incidents in the city, including the jail.  The reports involved in-custody deaths, categorical use of force by jail staff or peace officers, significant injuries sustained by department personnel, officer-involved shootings, and related incidents.

I developed, approved, and implemented the BWC policies with community groups and stakeholders.  I reviewed and approved plans allowing medical and mental health professionals to assess inmates in custody.  I also met with the City Manager and City Attorney regarding high-risk incidents, civil litigation, community concerns, budget, and other related items.  I served as the Pasadena Police Department's project manager to help select, purchase, and implement the Body-Worn Camera program (one of the first in Los Angeles County) and upgrade the In-Car Video system.  I implemented an electronic tracking program to preserve the integrity of evidence.

I designed and implemented the department's rifle program, authorizing officers to care for and use (if necessary) the urban police rifle at the Rose Bowl Stadium during significant events, which helped reduce the homeland security threat.  I frequently met with the department's firearm cadre to design and implement progressive use of force and range training, which included contemporary tactics (three-gun system), decision-making, cover and concealment, and de-escalation.

I served as the Pasadena Police Chief for nearly eight years retiring in April 2018.

During my career, I collaborated closely with the City of Pasadena Public Health Department, the Los Angeles County Department of Public Health, Councils of Governments (COGs), Subregions in Los Angeles County, and nonprofit and governmental organizations to address concerns associated with mental health illness among the unhoused population.  I also work with the Department of Housing and Livability to identify transitional, temporary, and permanent housing for homeless families, emancipated adults, and at-risk people.

I supervised and managed the Santa Monica and Pasadena Police Department's Homeless Outreach Teams, which worked collaboratively with professional mental health caregivers to increase access to social service programs, housing resources, case management, and shelter for the unhoused population.  I actively recruited experienced mental health clinicians and social workers, integrating them into the outreach police teams and increasing the department's immediate intervention capacity.  I coordinated with the other city departments (housing, public works, fire, and community resources) in Pasadena and Santa Monica in the collective efforts to address the impact of homelessness on the community.  I implemented Mental Health Awareness & Response Training for the Santa Monica and Pasadena Police Departments.

As a professional law enforcement officer, I instructed hundreds of law enforcement officers (local, state, federal, and international) and personnel assigned to military special operations units.  I lectured on various topics, including the use of force, special weapons & tactics, patrol

tactics, weaponless defense & de-escalation techniques, incident command and control, crowd dynamics & civil unrest, discipline and accountability, mass casualty response, leadership, civil liability, personnel investigations, community policing, community partnerships, audits, managing jail facilities, officer survival, managing significant scale events, homeland security, fusion center leadership, information sharing, and related topics.

I authored several articles on the impact of stress during critical incidents, police training, firearms training, and cognitive decision-making, published in police periodicals and professional journals.  I led the research efforts and approved and implemented various firearms, impact devices, less-lethal weapon systems, and ammunition for various police organizations, including the Pasadena and Santa Monica police departments.

As a police instructor, I refined the officer survival mindset, including de-escalation tactics and communication skills, firearms and less-lethal devices, ground fighting techniques, defensive tactics, and arrest and control tactics for peace officers and military operators.  I studied and taught on the topic of decision-making for first responders under extreme stress and, in conjunction with the fire service, implemented the Tactical Emergency Medical Support (TEMs) protocols to mitigate the impacts of the active shooter threat at the Pasadena and Santa Monica Police Departments.

I earned a master's from the United States Naval Postgraduate School, Center for Homeland Defense and Security (with honors, class speaker), and an undergraduate Degree from the University of Redlands (with honors).  I also earned several prestigious professional certificates, including the Harvard University, John F. Kennedy School of Government, Senior Management Institute for Police, the Federal Bureau of Investigation, National Academy, Federal Bureau of Investigations, Southwest Command College, Leadership Los Angeles, and the California Peace Officer Standard and Training (POST), Command College (honors, class speaker).

I received California Peace Officer Standards and Training Executive, Management, Supervisory, Advanced, Intermediate, and Basic certificates.  I earned instructor credentials in firearms, arrest, and control tactics, military operators in urban terrain, defensive tactics, and impact weapons.

As a police practice consultant, I have assisted other law enforcement agencies in developing best practices governing the use of force, investigative protocols, evidence collection and preservation, audits, and technology.  I have served individuals, law enforcement agencies, and municipalities in Los Angeles, Orange, Fresno, Monterey, San Diego, Santa Barbara, San Bernardino, and Riverside counties.  My education, training, and experience are in my attached resume (CV).

In the past five years, I have provided sworn testimony at six (6) separate depositions: Terresa Perkins v. the City of Anaheim, USDC Case No: 8:19-CV-00315-JLS-JDE; 2021; A.I.P. Padilla v. City of Santa Ana, USDC Case No: 30-2019-01087075-CU-PO-CJC; Joseph Perez v.

American Ambulance, USDC Case No: 1:18-cv-00127-AWI-EPG; Wolfgang Montford v. The City of Santa Monica, USDC Case No: 2:20-CV-7220-MS-Ex; The City of Santa Ana v. Mental Health Association of Orange County, Case No. OCSC: 30-2020-01124174-CU-MC-JC; and Joseph L. Garces v. The City of Santa Paula, Case No. USDC 2:21-cv-6730-FLA(PVCx).

I have testified as a police practice expert in E. Rodriguez v. City of Santa Monica, Case No: OAH 2020090173, and the City of Santa Ana v. Mental Health Association of Orange County, Case No. OCSC: 30-2020-01124174-CU-MC-JC.

In the matter of ANGELINA ATABEKOVA-MICHAELIDIS and VADROUI MICHAELIDOU, both individually and as successor in interest to the Decedent MELKON MICHAELIDIS, Plaintiffs, v. the CITY of LOS ANGELES, BRYAN MORALES; and DOES 1-10, inclusive, Defendants, USDC Case Number: 2:22-cv-05620-MCS-MAAx, I reviewed the following material, recordings, reports, videos, and documents to form the basis of my conclusions and opinions:

- The complaint, USDC Case Number: 2:22-cv-05620-MCS-MAAx.
- Tab 001, In custody death report, D.M. Johnson, DEF 0062.
- Tab 002, Death investigation report, D.M. Johnson, DEF 0051.
- Tab 003, Death investigation report, D.M. Johnson, DEF 0953.
- Tab 004, Detective daily report, Det. Bowswer, DEF 0032 – 34.
- Tab 005, Detective daily report, Det. Bowswer, DEF 0930 – 932.
- Tab 006, Gang enforcement detail report, Miranda, DEF 028 – 30.
- Tab 007, Gang enforcement detail report, Miranda, DEF 0926 – 928.
- Tab 008, Incident recall details report, DEF 0067 – 108.
- Tab 009, Incident recall details report, DEF 0899 – 903.
- Tab 010, Investigative report, Assault with a deadly weapon, FID Johnson, DEF 0039 – 41.
- Tab 011, Investigative report, Assault with a deadly weapon, FID Johnson 0941 – 943.
- Tab 012, Evidence analyzed report, Thompson, DEF 0056.
- Tab 013, Evidence Analyzed report, Thompson, DEF 0980.
- Tab 014, Autopsy report, DEF 0522 – 550.
- Tab 015, Autopsy report, DEF 0954 – 977.
- Tab 016, CAD summaries report, DEF 0147 – 235.
- Tab 017, Call log history report, DEF 0001 – 5.
- Tab 018, CLETS report, Michaelidis, DEF 0657 – 658.
- Tab 019, Evidence collection report, DEF 0054 – 55.
- Tab 020 FID OIS report, DEF 0870 – 898.
- Tab 021, FID photos, Flores, DEF 0045.
- Tab 022, FID photos, Flores, DEF 0947.
- Tab 023, Lab drug analysis, Van Cleve, DEF 0052 – 53.
- Tab 024, Laboratory DNA collection report, Flores, DEF 0978 – 979.
- Tab 025, Laboratory test fire report, Woiwode, DEF 0059.
- Tab 026, Laboratory test fire report, Woiwode, DEF 0983.
- Tab 027, Laten impression value determination report, Salazar, DEF 058.

- Tab 028, Laten impression value determination report, Salazar, DEF 0982.
- Tab 029, Laten print investigation report, Thompson, DEF 0057.
- Tab 030, Laten print investigation report, Thompson, DEF 0981.
- Tab 031, Prehospital care report, LAFD, DEF 0042 – 44.
- Tab 032, Prehospital care report, LAFD, DEF 0944 – 946.
- Tab 033, Property Report, Flores, DEF 0046 – 47.
- Tab 034, Property Report, Flores, DEF 00948 – 949.
- Tab 035, Property Report, Flores, DEF 0048.
- Tab 036, Property Report, Flores, DEF 0950.
- Tab 037, Property Report, Woiwode, DEF 0050.
- Tab 038, Property Report, Woiwode, DEF 0952.
- Tab 039, Property Report, remote, Flores, DEF 0049.
- Tab 040, Property Report, remote, Flores, DEF 0951.
- Tab 041, Registration Report, Geosystems, DEF 0988 – 993.
- Tab 042, Sergeant's daily report, Balgemino, DEF 0019 – 21.
- Tab 043, Sergeant's daily report, Balgemino, DEF 0917 – 918.
- Tab 044, Sergeant's daily report, Balgemino, DEF 0917 – 919.
- Tab 045, Sergeant's daily report, Bogart, DEF 0035.
- Tab 046, Sergeant's daily report, Bogart, DEF 0933.
- Tab 047, Sergeant's daily report, Goldberg, DEF 0022 – 25.
- Tab 049, Sergeant's daily report, Kwun, DEF 0036 – 37.
- Tab 050, Sergeant's daily report Kwun DEF 0934 – 935.
- Tab 051, Sergeant's daily report, Lim, DEF 0015 – 16.
- Tab 052, Sergeant's daily report, Lim, DEF 0913 – 914.
- Tab 053, Sergeant's daily report, Quimbita, DEF 026 – 27.
- Tab 054, Sergeant's daily report, Quimbita, DEF 924 – 925
- Tab 055, Sergeant's daily report, Stepan, DEF 0017 – 18.
- Tab 056, Sergeant's daily report, Stepan, DEF 0915.
- Tab 057, Sergeant's daily report, Stepan, DEF 0915 – 916.
- Tab 058, Sergeant's daily report, Tejeda, DEF 0031.
- Tab 059, Sergeant's daily report, Tejeda, DEF 0929.
- Tab 060, Sound graph analysis of gunshots, Officer Morales, DEF 1001 – 1006.
- Tab 061, TEAMS report, Morales, DEF 2207 – 2213.
- Tab 062, Vandalism Report, Arzate & King, DEF 0063 – 66.
- Tab 063, Vandalism Report, Arzate & King, DEF 0937 – 940.
- Tab 064, Watch Commander's daily report, McDonald, DEF 0006 – 14.
- Tab 065, Watch Commander's daily report, McDonald, DEF 0904 – 912.
- Tab 066, Weapon discharge inspection report, Castillo, DEF 0996.
- Tab 067, Weapons discharge inspection, Mattamira, DEF 0996.
- Tab 068, Weapons discharge inspection, McComas, DEF 0995.
- Tab 069, Use of Force Review Board Report, DEF 2204 – 2206.
- Tab 070, Search Warrant, 6459 Matillja, DEF 0659 – 664.
- Tab 071, Summary of Findings, UOF by LABPC, DEF 2076 – 2102.
- Tab 072, Canvassing Log, DEF 0236 – 238.

- Tab 073, Chief of Police 24-hour, log, DEF 0994.
- Tab 074, Crime Scene log, DEF 0239 – 240.
- Tab 075, Crime Scene log, exterior, DEF 1937 – 1939.
- Tab 076, Crime Scene log, inner, DEF 0242 – 243.
- Tab 077, Chronological Investigation record, DEF 0241.
- Tab 078, Crime Scene log, inner, DEF 1940 – 1941.
- Tab 079, Firearms inventory tracking system, DEF 0998 – 1000.
- Tab 080, Incident Notification log, DEF 0060 – 61.
- Tab 081, Incident Notification log, DEF 0984 0 985.
- Tab 082, PMDC State Responses, vehicle registration, DEF 0126 – 128.
- Tab 083, PMDC State Responses, Michaelidis court records, DEF 0121 – 125.
- Tab 084, PMDC State Responses, Michaelidis, DMV record, DEF 0113 – 120.
- Tab 085, PMDC State Responses, Michaelidis, DMV record, DEF 0109 – 112.
- Tab 086, PMDC State Responses, Michaelidis, records, DEF 0129 – 146.
- Tab 087, Officer information and Interview notes, Alvarez, DEF 1946 – 1955.
- Tab 088, Officer information and Interview notes, Benavides, DEF 1962 – 1974.
- Tab 089, Officer information and Interview notes, Burem, DEF 1975 – 1980.
- Tab 090, Officer information and Interview notes, Castillo, DEF 1981 – 1989.
- Tab 091, Officer information and Interview notes, Garcia, DEF 1994 – 2002.
- Tab 092, Officer information and Interview notes, Mattamira, DEF 2007 – 2016.
- Tab 093, Officer information and Interview noes, McComas, DEF 2017 – 2033.
- Tab 094, Officer information, Morales, DEF 1942 – 1945.
- Tab 095, Officer Review checklist, DEF 2103 – 2110.
- Tab 096, Notes by Arteaga, DEF 1926 – 1927.
- Tab 097, Notes by Grave, DEF 1928 – 1929.
- Tab 098, Notes by Illig, DEF 1930 – 1032.
- Tab 099, Notes by Medina, DEF 1933 – 1936.
- Tab 100, Notes by Trtyan, DEF 1925.
- Tab 101, Interview notes, Arnold, DEF 1899 – 1901.
- Tab 102, Interview notes, Cutrer, DEF 1902 - 1906.
- Tab 103, Interview notes, Dreher, DEF 1990 – 1993.
- Tab 104, Interview notes, Gasparyan, A, DEF 1910 – 1911.
- Tab 105, Interview notes, Gasparyan, T, DEF 1907 – 1909.
- Tab 106, Interview notes, Karo, DEF 1913.
- Tab 107, Interview notes, Khacheryan, T, DEF 1915.
- Tab 108, Interview notes, Khacheryan, T, DEF 1914.
- Tab 109, Interview notes, Marinko, M. DEF 1916.
- Tab 110, Interview notes, Musayelyan, K, DEF 1917.
- Tab 111, Interview notes, Phanthavong, C, DEF 1918 – 1919.
- Tab 112, Interview notes, Balgemono, DEF 1956 – 1961.
- Tab 113, Interview notes, Goldberg, DEF 2003 – 2006.
- Tab 114, Interview notes, Siranish, DEF 1912.
- Tab 115, Interview notes, Strambulyan, DEF 1920 – 1924.
- Tab 116, Memorandum, Assessment of Supervisor Response, UOF, DEF 0986 – 987.

- Tab 117, Memorandum, OIS Review by Chief Moore, DEF 2111 – 2138.
- Tab 118, Memorandum, OIS Review, Inspector General, DEF 2139 – 2199.
- Tab 119, Memorandum, Individual Findings, BPC OIS, DEF 2200 – 2203.
- Tab 120, Message to Johnson re: Michaelidis, DEF 0038.
- Tab 121, Message to Johnson re: Michaelidis, DEF 0936.
- Tab 200, Audio, Initial 911 call, Zarton, DEF 0863.
- Tab 201, Audio, Follow-up 911 call, Zarton, DEF 0864.
- Tab 202, Audio, Follow-up 911 call, Zarton (2), disconnected, DEF 0865.
- Tab 203, Audio, Follow-up 911 call, Zarton (3), DEF 0868.
- Tab 204, Audio, 911 call, Ramos, DEF 0866.
- Tab 205, Audio 911 call, the female neighbor on Matilija, DEF 0867.
- Tab 206, Audio, Interview of Alvarez, DEF 2223.
- Tab 207, Transcription of Statement, Alvarez, DEF 1007 – 1086.
- Tab 208, Audio, Interview of A. Malcolm, DEF 1087 – 1121.
- Tab 209, Transcription of Statement, A. Malcolm, DEF 1087 – 1121.
- Tab 210, Audio, Interview of Balgemino, DEF 2229.
- Tab 211, Transcription of Statement, Balgemino, DEF 1122 – 1163.
- Tab 212, Audio, Interview of Benavides, DEF 2222.
- Tab 213, Transcription of Statement, Benavides, DEF 1164 – 1214.
- Tab 214, Audio, Interview of Burecu, DEF 2225.
- Tab 215, Transcription of Statement, Burecu, DEF 1215 – 1255.
- Tab 216, Audio, Interview of Castillo, DEF 2224.
- Tab 217, Transcription of Statement, Castillo, DEF 1264 – 1314.
- Tab 218, Audio, Interview of Dreher, DEF 2228.
- Tab 219, Transcription of Statement, Dreher, DEF 1347 – 1375.
- Tab 220, Audio, Interview of Garcia, DEF 2227.
- Tab 221, Transcription of Statement, Garcia, DEF 1376 – 1426.
- Tab 222, Audio, Interview of Garginyan, A, DEF 2233.
- Tab 223, Transcription of Statement, Garginyan, A, DEF 1427 – 1442.
- Tab 224, Audio, Interview of Gasparyan, T, DEF 2234.
- Tab 225, Transcription of Statement, Gasparyan, T, 1443 – 1461.
- Tab 226, Audio, Interview of Goldberg, DEF 2230.
- Tab 227, Transcription of Statement, Goldberg, DEF 1462 – 1486.
- Tab 228, Audio, Interview of Khacheryan, T, DEF 2231.
- Tab 229, Transcription of Statement, Khacheryan T, DEF 1510 0 1533.
- Tab 230, Audio, Interview of Karo, DEF 2216.
- Tab 231, Transcription of Statement, Karo, DEF 1487 – 1509.
- Tab 232, Audio, Interview of Mattamira, DEF 2226.
- Tab 233, Transcription of Statement, Mattamira, DEF 1534 – 1581.
- Tab 234, Audio, Interview of McComas, DEF 2221.
- Tab 235, Transcription of Statement, McComas, DEF 1624 – 1662.
- Tab 236, Audio Interview of Morales, DEF 2220.
- Tab 237, Transcription of Statement, Morales, DEF 1663 – 1757.
- Tab 238, Audio, Interview of Phanthavog, C., DEF 2214.

- Tab 239, Transcription of Statement, Phanthavog, C., DEF 1758 – 1795.
- Tab 240, Audio, Interview of Stambulyan, M, DEF 2219.
- Tab 241, Transcription of Statement, Stambulyan, M, DEF 1796 – 1826.
- Tab 242, Audio, Interview of Stambulyan, V, DEF 2232.
- Tab 243, Transcription of Statement, Stambulyan, V, DEF 1827 – 1886.
- Tab 244, Audio, Interview of Trtryan, M, DEF 221.
- Tab 245, Transcription of Statement, Trtryan, M, DEF 1887 – 1898.
- Tab 246, Audio, Interview of Cutrer, DEF 2217.
- Tab 247, Transcription of Statement, Cutrer, DEF 1315 – 1346.
- Tab 248, Translation of Statement, Castillo, DEF 1256 – 1263.
- Tab 300, Incident video 1, P0041.
- Tab 301, Incident video 2, P0042.
- Tab 302, Incident video 3, P0043.
- Tab 303, Melkon dancing video, P0044.
- Tab 304, https://youtu.be/xy_2C1L9be8, Van Nuys Area OIS, MORALES 000001.
- Tab 305, Alvarez BWC video, DEF 2235.
- Tab 306, Arzate – 01, BWC video, DEF 2236.
- Tab 307, Arzate – 02, BWC video, DEF 2237.
- Tab 308, Benavidez – 01, BWC video, DEF 2238.
- Tab 309, Benavidez – 02, BWC video, DEF 2239.
- Tab 310, Burecu – 01, BWC video, DEF 2240.
- Tab 311, Burecu – 02, BWC video, DEF 2241.
- Tab 312, Castillo – 01, BWC video, DEF 2242.
- Tab 313, Castillo – 02, BWC video, DEF 2243.
- Tab 314, Garcia – 01, BWC video, DEF 2244.
- Tab 315, Garcia – 02, BWC video, DEF 2246.
- Tab 316, Goldberg, BWC video, DEF 2246.
- Tab 317, Head & Krauss, BWC video, 2256.
- Tab 318, King, BWC video, DEF 2257.
- Tab 319, Lewison & Sok, BWC video, DEF 2257.
- Tab 320, Mattamira, BWC video, DEF 2248.
- Tab 321, McComas – 01, BWC video, DEF 2249.
- Tab 322, McComas – 02, BWC video, DEF 2250.
- Tab 323, Transcription of BWC, McComas, DEF 1582 – 1623.
- Tab 324, Morales – 01, BWC video, DEF 2251.
- Tab 325, Morales – 02, BWC video, DEF 2252.
- Tab 326, CCTV video 1, DEF 2260.
- Tab 327, BWC video No. 2, DEF 2261.
- Tab 328, BWC video No. 3, DEF 2262.
- Tab 329, BWC video No. 4, DEF 2263.
- Tab 330, BWC video No. 5, DEF 2264.
- Tab 331, BWC video No. 6, DEF 2265.
- Tab 332, BWC video No. 7, DEF 2266.
- Tab 334, Dash cam, Alvarez and Mattamira, DEF 2254.

- Tab 335, Dash cam, Benavides and Morales, DEF 2259.
- Tab 336, Dash cam, Burecu and McComas, DEF 2258.
- Tab 337, Dash cam, Castillo and Garcia, DEF 2255.
- Tab 337, Dash cam, Dreher and Madrigal, DEF 2253.
- Tab 500, photographs, Autopsy, DEF 0577 – 656.
- Tab 501, photographs, Officer-issued weapons, DEF 0320 – 330.
- Tab 502, photographs, Officer processing, POST OIS, DEF 2024 – 2075.
- Tab 503, photos, Scene – exterior, DEF 0244 – 394.
- Tab 504, photographs, Scene – interior, DEF 0366 – 391.
- Tab 505, photographs, Scene markers, DEF 0426 – 319.
- Tab 506, photographs, Scene, markers, officer vehicle, weapons, DEF 0461 – 521.
- Tab 507, photographs, Scene Michaelidis, DEF 0395 – 576.
- Tab 508, photographs, Vehicles on the scene, DEF 0280 – 342.
- Tab 1000, policy, Employee Involved in UOF incident #245, DEF 0686 – 698.
- Tab 1001 policy, Investigative Responsibility, UOF, DEF 0671 – 682.
- Tab 1002, policy, Obtaining Public Safety Statement, #795, DEF 0683 – 684.
- Tab 1003, policy, Officer Involved Shootings, #769, DEF 0684 – 685.
- Tab 1004, policy, Special Order 23, Use of Force, DEF 0719 – 724.
- Tab 1005, policy, Use of Force, DEF 0665 – 670.
- Tab 1006, policy, Directive No. 1.2 Use of Force, DEF 0699 – 704.
- Tab 1007, policy, Directive No. 6.4 Beanbag Shotgun, DEF 0705 – 709.
- Tab 1008, Directive No. 16, Tactical De-Escalation Techniques, DEF 0710 – 712.
- Tab 1009, Directive, 40mm Less-Lethal Launcher, DEF 0713 – 718.
- Tab 1010, Directive, Tactical De-Escalation Techniques, DEF 0710 – 712.
- Tab 1011, Training Bulletin, Handcuffing, DEF 0725 – 731.
- Tab 1012, Training Bulletin, Preservation of Evidence, DEF 0732 – 734.
- Tab 1013, Training Bulletin, Rendering Media Aid, DEF 0735 – 743.
- Tab 1014, Training Bulletin, Tactical Disengagement, DEF 0740 – 743.
- Tab 1015, Training Bulletin, Weapons other than Firearms, DEF 0744 – 748.
- Tab 1016, POST Basic Course, Use of Force Workbook, Version 3.4, DEF 0749 – 862.
- Deposition Transcription, Morales, B., Full.
- Deposition Transcription, Morales B, cond.

**Incident Scene:**

Victory Boulevard is an improved roadway designed for vehicular and pedestrian travel. The road is undivided with seven lanes (east-west). The street measures approximately 73 feet from curb to curb, with concrete sidewalks on the north and south. Although the incident occurred during daylight hours, Victory Boulevard has several streetlamps to illuminate the roadway during darkness. Victory Boulevard interest Matilijia Avenue (T-Intersection) on the north.[1]

---

[1] Google Instant Street View, https://www.instantstreetview.com/@34.186615,-118.433454,326.77h,-5.73p,0.59z,lrz_OJ6zlF8qudrZheFl_g; Los Angeles Police Department, FID Report, Bates Stamp: DEF 0870 – 0898.

Matilijia Avenue is an improved roadway designed for vehicular and pedestrian travel.  The road is undivided, with two lanes (north and south).  There are concrete sidewalks on the east and west.  Although the incident occurred during daylight hours, Mitilijia Avenue has several streetlamps to illuminate the roadway during darkness.[2]

**Incident Summary:**

On October 31, 2021, at about 3:27 p.m., Los Angeles police officers assigned to the Van Nuys Patrol Division responded to a call for service regarding a possible vandalism suspect at 6459 Miatilija Avenue.  The suspect was identified as Melkon Michaelidis and was reported to be under the influence of narcotics or experiencing a mental health episode.

On arrival, the patrol officers attempted to communicate with Michaelidis for more than 40 minutes outside his residence.  While speaking with Michaelidis, the officers developed a plan to contact him (while maintaining a safe distance) and tried to de-escalate the situation verbally.  The officers asked Michaelidis to exit his home so they could assist him; however, he (Michaelidis) refused.  A Van Nuys patrol supervisor arrived at the location and determined that a tactical disengagement was viable based on the circumstances and Michaelidis's behavior.  The supervisor consulted the Van Nuys Patrol Watch Commander and the Los Angeles Police Department's Mental Evaluation Unit (MEU) before leaving the scene.[3]

On the same day, at about 5:09 p.m., a second call for service was generated when Michaelidis exited his residence and was observed on Matilija Avenue armed with two knives.  Several people who witnessed Michaelidis's behavior called 911 and told the emergency operator that he (Michaelidis) was armed with two knives and vandalizing motor vehicles parked on Matilija Avenue.  The emergency operator then sent the information about Michaelidis's conduct to the responding officers.[4]

Van Nuys Patrol Division uniformed officers responded to the call, driving marked Los Angeles police vehicles.  Officers Mattamira and Alverez (9A19) arrived first and observed Michaelidis standing near the middle of Victory Boulevard, west of Matilija Avenue.[5]  Michaelidis held a large knife in each hand.

Assisting peace officers arrived on Victory Boulevard parking their marked patrol vehicles north and south of the primary unit (9A19).[6]  For more than five minutes, the officers collectively shouted verbal orders demanding Michaelidis "drop the knives." Michaelidis advanced toward

---

[2] Google Instant Street View, https://www.instantstreetview.com/@34.186668,-118.433484,327.68h,-0.75p,0.07z,5zvahuIyRTjT271h3PMcew.

[3] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Inspector General, OIS Review, Bates Stamp DEF 2139 – 2199.

[4] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; CCTV Video 1, Bates Stamp:  DEF 2260; Transcription of Statement, Vardan Stambulyan, Bates Stamp:  DEF 1827 – 1886; 911 Calls by Zarton, Bates Stamp: DEF 0863, 0864, 0865, 0868; Los Angeles Police Officer Morales's deposition, May 12, 2023, page 38.

[5] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898, Los Angeles Police Officer Morales's deposition, May 12, 2023, page 30; Los Angeles Police Officer Morales's deposition, May 12, 2023, page 39.

[6] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138

the officers while armed with one knife, and an officer-involved shooting (OIS) occurred. Michaelidis was struck by gunfire and less lethal projectiles.  Following the officer-involved shooting, the Van Nuys patrol officers initiated and maintained basic lifesaving (BLS) techniques on Michaelidis.  Paramedics from the Los Angeles Fire Department (LAFD) arrived and provided advanced lifesaving (ALS) techniques; however, Michaelidis succumbed to his injuries.[7]

### Opinions and Conclusions:

My Opinions and conclusions are based on my 38-year law enforcement career as a police officer, detective, supervisor, executive, or police chief.  I conducted, reviewed, or managed hundreds of force cases (including officer-involved shootings), high-risk incidents, and field and administrative investigations.  I taught weaponless defense, arrest & control techniques, less-lethal devices, de-escalation techniques, firearms, and tactical operations to municipal and county peace officers, military personnel, and international police officials.

I designed, implemented, and trained the Santa Monica Police Department Special Weapons (SWAT) and Patrol Rifle Teams.  I supervised the Santa Monica Police Department's Crisis Negotiation Unit and frequently interacted with them during critical incidents, including area searches, barricaded suspects, and hostage rescue events.

I served as a special weapons team leader and tactical operator during hundreds of critical incidents.  I also served as a tactical and incident commander at high-risk incidents, civil unrest, and mass protest events, including a venue for the Democratic National Convention hosted in the City of Santa Monica.  I frequently interacted with the United States Secret Service (USSS), the United States Military, local municipalities, and county, state, and federal law enforcement agencies implementing security measures and emergency protocols during presidential (POTUS) or other high-ranking officials while they were visiting Santa Monica.

As the Pasadena police chief, I was the Incident Commander for the Tournament of Roses Parade, the Rose Bowl Game, and numerous athletic, entertainment, and international events. The events required police intervention and resources to mitigate civil unrest and protests and manage large groups.  My responsibilities included security, event planning, crowd management and control, group dynamics, and civil unrest preparation.

I interacted with the United States Secret Service (USSS), the United States Military, local municipalities, and county, state, and federal law enforcement agencies implementing security measures and emergency protocols during presidential (POTUS) or other high-ranking officials while they were visiting Pasadena.

As the police chief, I reviewed and evaluated officer-involved shootings, use-of-force incidents, vehicle pursuits, police helicopters as a tactical platform, and other high-risk incidents involving sworn and non-sworn personnel.  I chaired the Pasadena Police Department's Use of Force

---

[7] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Inspector General, OIS Review, Bates Stamp DEF 2139 – 2199; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp: DEF 2111- 2138.

Review Board and determined the level of culpability (if any) in matters alleging misconduct, the misuse of force, tactics, or equipment.

**Opinion 1:**

I believe Officer Morales had probable cause to contact and detain Michaelidis, who exited his residence (6459 Miatilija Avenue) armed with two knives and vandalized several vehicles.[8] Officer Morales's actions were objectively reasonable and consistent with California Penal Code 835a and the California Commission on Peace Officer Standards and Training, Learning Domain 15 (Laws of Arrest). ==A peace officer with equivalent training, experience, and knowledge would act similarly.[9]==

Michaelidis exited his apartment (6459 Miatilija Avenue) and stood in the middle of the roadway holding one knife to his neck and a second to his abdomen. Michaelidis then used the knives to slash or puncture tires on two cars parked on the street. He (Michaelidis) blocked a third vehicle from traveling north on Miatilija Avenue, and when the driver stopped to avoid striking Michaelidis, he used his knife to stab the hood.[10] Michaelidis' erratic and potentially criminal actions were witnessed by Vardan Stambulyan, who called 911.[11]

Officer Morales and his partner, Officer Benavides, monitored the 911 call (415 man with a knife), activated the emergency equipment (red lights and siren) on their marked police vehicle, and responded. Officer Morales, seated in the right front passenger of the police unit, and his

---

[8] Los Angeles Police Department, FID Report, Bates Stamp: DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp: DEF 2111- 2138; CCTV Video 1, Bates Stamp: DEF 2260; Transcription of Statement, Vardan Stambulyan, Bates Stamp: DEF 1827 – 1886; 911 Calls by Zarton, Bates Stamp: DEF 0863, 0864, 0865, 0868; 911 Call by William Ramos, Bates Stamp: DEF 0866.

[9] Probable cause, "… Probable cause is a requirement found in the Fourth Amendment that must usually be met before the police make an arrest, conduct a search, or receive a warrant. Courts usually find probable cause when there is a reasonable basis for believing that a crime may have been committed (for an arrest) or when evidence of the crime is present in the place to be searched (for a search). Under exigent circumstances, probable cause can also justify a warrantless search or seizure. Persons arrested without a warrant are required to be brought before a competent authority shortly after arrest for a prompt judicial determination of probable cause…," https://www.law.cornell.edu/wex/probable_cause; California Penal Code Section 835a, "*Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, prevent escape, or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested, nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance. (2017 - https://law.onecle.com/california/penal/835a.html)*"; California Commission on Peace Officer Standards and Training, Learning Domain 15, Laws of Arrest, Version 4.16.

[10] CCTV Video 1, Bates Stamp: DEF 2260; Transcription of Statement, Vardan Stambulyan, Bates Stamp: DEF 1827 – 1886; 911 Calls by Zarton, Bates Stamp: DEF 0863, 0864, 0865, 0868; 911 Call by William Ramos, Bates Stamp: DEF 0866; 911 Call by a Female Neighbor on Matilija Avenue, Bates Stamp: DEF 0867.

[11] Los Angeles Police Department, FID Report, Bates Stamp: DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp: DEF 2111- 2138; CCTV Video 1, Bates Stamp: DEF 2260; Transcription of Statement, Vardan Stambulyan, Bates Stamp: DEF 1827 – 1886.

partner arrived about five seconds after the primary unit (9A19, Officers Mattamira and Alverez).[12]

Officer Morales recognized Michaelidis (armed with two knives in the middle of Victory Boulevard) as the same subject involved in an earlier call at 6459 Miatilija Avenue.  Officer Morales exited his patrol vehicle, stood behind the passenger's front door, and unholstered his service pistol, holding it at the low ready (Officer Morales did not place his right index finger on the trigger of his service pistol).  Officer Morales then attempted to gain voluntary compliance from Michaelidis by ordering him to drop the knives.[13]

In this case, the material shows that Officer Morales had a legal and professional obligation to disarm Michaelidis, who had previously demonstrated a propensity for violence, and investigate the alleged vandalism.  However, since Michaelidis was armed with two knives and acting erratically, Officer Morales was precluded from safely conducting a field investigation.  His (Morales) immediate concerns were appropriately focused on disarming Michaelidis, treating his lacerations, evaluating his mental health, and safeguarding the public.  Once Michaelidis was detained and the situation was static, Officer Morales or other Los Angeles police officers (as directed by a supervisor) could have safely conducted a preliminary investigation to determine if Michaelidis was responsible for vandalizing private property.

**Opinion 2:**
Officer Morales attempted to de-escalate a stand-off between Michaelidis, armed with two knives, and several other Los Angeles police officers were objectively reasonable.  Officer Morales's actions were consistent with department policy and the California Commission on Peace Officer Standards and Training, Learning Domain 20, Use of Force.  A peace officer with equivalent training, experience, and knowledge would act similarly.[14]

Officer Morales and his partner, Officer Benavides, responded to a 911 call regarding a man armed with knives.  The officers responded to the call using the emergency equipment of their marked police vehicle.  Officer Morales (seated in the right front passenger seat) and his partner arrived about 5 seconds after the primary unit (9A19, Officers Mattamira, and Alvarez).  Officer Morales exited his patrol vehicle and drew his service pistol, holding it at the low ready.  Although Officer Morales declared himself the Designated Cover Officer (DCO), he did not initially put his right index finger on the trigger of his service pistol, demonstrating he was not

---

[12] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; CCTV Video 1, Bates Stamp:  DEF 2260; Transcription of Statement, Vardan Stambulyan, Bates Stamp:  DEF 1827 – 1886; 911 Calls by Zarton, Bates Stamp: DEF 0863, 0864, 0865, 0868; Los Angeles Police Officer Morales's deposition, May 12, 2023, page 38.
[13] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; Los Angeles Police Officer Morales's BWC video, Bates Stamp:  DEF 2252; BWC Video 2, Bates Stamp:  DEF 2261.
[14] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; Los Angeles Police Officer Morales's BWC video, Bates Stamp:  DEF 2252; California Commission on Peace Officer Standards and Training, Learning Domain 20, Use of Force; Los Angeles Police Department, Use of Force Tactics Directive 16, Tactical De-Escalation Techniques, October 2016, Bates Stamp:  DEF 0710 – 0712.

prepared to shoot.  In concert with other Los Angeles police officers at the scene, Officer Morales immediately started issuing verbal commands ordering Michaelidis to drop the knives.

Officer Morales and other Los Angeles police officers attempted to contain Michaelidis's movements and reduce the risk to the public by securing the immediate area (traffic and pedestrian control); however, this effort was arduous based on the totality of the circumstances. While attempting to de-escalate the incident tactically, it is noteworthy that Officer Morales was never the aggressor.  He (Morales) maintained a safe position behind the passenger door of his patrol vehicle, which allowed him to evaluate a rapidly evolving event.  The position of Officer Morales's police car and his use of cover allowed him (Morales) to safely issue several verbal commands demanding Michaelidis drop the knives and surrender.[15]

Concerning tactical communication, Officer Morales's orders (drop the knife) were clear, concise, and easy to understand.  Officer Morales never provoked, challenged, or deliberately aggravated Michelidis.  However, Officer Morales did use profanity at one point in the event to gain Michelidis's attention and emphasize the urgency of his verbal orders.[16]  Even when Officer Morales designed himself as the DCO (designated cover officer), his professionalism, tactical acuity, and concern for Michelidis, fellow officers, and the nearby public remained the same.[17]

In this case, the material showed that Officer Morales used his knowledge, training, and experience to de-escalate a very tense and dangerous situation.  Officer Morales's efforts to tactically de-escalate the incident were unsuccessful; however, Michaelidis refused to comply with the lawful orders to disarm and surrender peacefully.

**Opinion 3:**
Officer Morales's use of lethal force was objectively reasonable and consistent with California Penal Code Section 835a, department policy, and the California Commission on Peace Officer Standards and Training, Learning Domain 20, Use of Force**.**[18] A peace officer with equivalent training, experience, and knowledge would act similarly.

---

[15] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; Los Angeles Police Officer Morales's BWC video, Bates Stamp:  DEF 2252; Los Angeles Police Morales's deposition, May 12, 2023, pages 57, 58, 61, 76, 77.

[16] Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; Los Angeles Police Officer Morales's video, Bates Stamp:  DEF 2252; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp:  DEF 1663 – 1757.

[17] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp:  DEF 1663 – 1757; Los Angeles Police Officer Morales's deposition, May 12, 2023, page 47.

[18] California Penal Code Section 835a, "*Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, prevent escape, or to overcome resistance.  A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested, nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance.  (2017 - https://law.onecle.com/california/penal/835a.html)*; Los Angeles Police Department, Office of the Chief of Police, Special Order 23, "Policy on the Use of Force – Revised," and LAPD Manual, Volume I, Section 556.10;  Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; Los

On arrival, Officer Morales observed Michaelidis armed with two knives and standing in the middle of Victory Boulevard 10 – 15' east of the primary marked police vehicles.  Michaelidis actions were erratic as he advanced toward the officers who were standing near their police SUV.[19]

Officer Morales exited his marked patrol vehicle, took cover behind the passenger's door, unholstered his service pistol, and designated himself as the DCO (designated cover officer) by verbally stating he had "lethal coverage." Once outside the patrol vehicle, Officer Morales briefly aimed his pistol at Michaelidis; however, moments later, he (Morales) repositioned the gun to the low ready.  At that time, Officer Morales also issued several verbal orders demanding that Michaelidis disarm.  Since other uniformed officers were giving verbal orders demanding Michaelidis drop the knives, he (Morales) appropriately limited the number of verbal orders and remained focused on Michaelidis's movements/actions.[20]

When Officer Morales declared himself as the DCO, his pistol was at the low ready, and he did not initially place his right index finger on the trigger (indicating Morales was not prepared to shoot immediately).[21] By holding his pistol at the low ready, Officer Morales could better evaluate the rapidly evolving situation and determine, based on Michaelidis's actions, if any force was necessary and reasonable.

When Officer Morales declared himself as the DCO, Officer Mattamira stood immediately south of him (just a few feet away and near the driver's door of her marked police unit, parked in the middle of Victory Boulevard).  Initially, Officer Mattamira had unholstered her firearm and pointed it toward Michaelidis.  However, after a brief period, Officer Mattamira re-holstered her pistol and secured a less lethal 40mm launcher (possibly at the behest of Morales, who was standing about two feet north of Mattamira and yelled, "Get a 40mm).[22] As the DCO, Officer Morales had a duty to protect himself and his fellow officers who were armed with less lethal devices (40mm, bean bag shotgun, and a taser) and the members of the public who were standing

---

Angeles Police Officer Morales's BWC video, Bates Stamp:  DEF 2252; California Commission on Peace Officer Standards and Training, Learning Domain 20, Use of Force, Version 3.4.

[19] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp:  DEF 1663 – 1757; Los Angeles Police Officer Morales's deposition, May 12, 2023, pages 58, 59.

[20] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp:  DEF 1663 – 1757; Los Angeles Police Officer Morales's deposition, May 12, 2023, pages 47, 66, 76, 77.

[21] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp:  DEF 1663 – 1757; Los Angeles Police Officer Morales's BWC video, Bates Stamp: DEF 2252; Los Angeles Police Officer Morales's deposition, May 12, 2023, page 66.

[22] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Officer Morales' BWC video, Bates Stamp:  DEF 2252; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp: DEF 1663 – 1757.

nearby on Victory Boulevard.[23] A DCO can limit the number of officers who unholster and aim their service firearms at a subject.  Moreover, if lethal force becomes necessary (depending on the subject's actions), having a DCO can reduce the number of officers discharging firearms (pistol, rifle, or shotgun).

At the time Officer Morales declared himself as the DCO (yelling he had "lethal coverage"), he told FID investigators that he was unaware if any other Los Angeles police officer (involved in the incident) was pointing a firearm toward Michaelidis (police unit 9A19 was parked immediately south of Officer Morales's position obscuring a clear view to his right).[24]  As the DCO, Officer Morales's primary responsibility was to remain focused on Michaelidis and evaluate his actions.  Officer Morales's DCO duties reduced his ability to assess the position of his fellow officers or determine which weapon systems they had deployed.[25]

Officer Morales estimated that Michaelidis was about 10 - 15' directly east of Officers Mattamira and Alverez and was advancing toward them.[26]  He (Morales) told FID investigators that he could hear several peace officers continuously throughout the incident, issuing verbal commands demanding that Michaelidis stop, drop the knives and surrender.[27]  Based on the documentation in this case, the verbal orders were simple, direct, and specific (stop, drop the knives); however, Michaelidis refused to comply with the lawful orders.[28]

When Michaelidis was east of Officers Mattamira and Alverez, he (Michaelidis) stopped, took a few steps back, dropped to his knees, and remained there temporarily (about two minutes).[29]

---

[23] Los Angeles Police Officer Morales's deposition, May 12, 2023, pages 76, 77, 139, 144; I was a weaponless defense, firearms, and tactics instructor throughout my 38-law enforcement career and taught officer survival at the basic police academy.

[24] Los Angeles Police Officer Morales's BWC video, Bates Stamp:  DEF 2252; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp:  DEF 1663 – 1757; Los Angeles Police Officer Morales's deposition, May 12, 2023, pages 54, 64, 65.

[25] I was a weaponless defense, firearms, and tactics instructor throughout my 38-law enforcement career and taught officer survival at the basic police academy.

[26] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Officer Morales's BWC video, Bates Stamp:  DEF 2252; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp: DEF 1663 – 1757; Los Angeles Police Officer Morales's deposition, May 12, 2023, pages 55, 56.

[27] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; Los Angeles Police Officer Morales's BWC video, Bates Stamp:  DEF 2252; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp:  DEF 1663 – 1757; Los Angeles Police Officer Mattamirea's DICVS video, Bates Stamp:  DEF 2254; Los Angeles Police Officer Morales's deposition, May 12, 2023, pages 56, 57, 58, 60, 61, 66, 69, 70, 76, 78, 79, 85, 87, 96, 97, 160.

[28] Los Angeles Police Officer Morales's BWC, Bates Stamp:  DEF 2252; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp:  DEF 1663 – 1757; Los Angeles Police Officer Mattamirea's DICVS video, Bates Stamp:  DEF 2254; BWC Video 2, Bates Stamp:  DEF 2261; Los Angeles Police Officer Morales's deposition, May 12, 2023, pages 57, 66.

[29] Los Angeles Police Officer Morales's BWC, Bates Stamp:  DEF 2252; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp:  DEF 1663 – 1757; Los Angeles Police Officer Mattamirea's DICVS video, Bates Stamp:  DEF 2254; BWC Video 2, Bates Stamp:  DEF 2261; Los Angeles Police Officer Morales's deposition, May 12, 2023, pages 75, 171.

Michaelidis then stood up, holding a knife in his right hand, and took several steps toward Officers Alverez, Castillo, and Garcia (advancing west on Victory Boulevard).[30]

Michaelidis used his right hand to point at the officers directly west of him on Victory Boulevard and counted them aloud.  He (Michaelidis) then transferred the knife to his left hand, took several steps back, and appeared to make a religious gesture (crossing himself) with his right hand.  While making the religious gesture, Michaelidis moved his right hand straight from his right to his left shoulder.  Officer Morales, who had a clear view of Michaelidis, said he perceived Michaelidis's motion as a "slit-your-neck" sign.  In his statement, Officer Morales told FID investigators, based on Michaelidis's movement ("slit-you-neck"), that he intended to assault the officers standing directly west of him (Alverez, Castillo, Garcia).[31]

Michaelidis continued advancing toward Officers Alvarez, Castillo, and Garcia, deliberately ignoring their commands to stop and drop the knife.  As Michaelidis advanced, he pointed at Officer Castillo with his right hand while holding the knife in his left hand with the edge tucked along his forearm.[32]

In my opinion, based on the totality of the circumstances (Michaelidis was armed with two knives near law enforcement officers, his arm and torso movements, and his refusal to comply with their lawful orders to disarm) and personal experience, I believe that a reasonable peace officer could interpret his (Michaelidis) deliberate actions as actively resisting, threatening,  or displaying "pre-assault indicators" (position, tone of voice, movements, and focus).[33]

- Position:  Michaelidis stood east of Officers Alverez, Castillo, and Garcia.  Based on the verbal commands to disarm, Michaelidis could reasonably assume the officers would use force, if necessary, to stop him.  He had full use of his limbs and was ambulatory.  As he advanced, Officers Alverez and Castillo told FID investigators that Michaelidis was only

---

[30] Los Angeles Police Officer Morales's BWC, Bates Stamp:  DEF 2252; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp:  DEF 1663 – 1757; Los Angeles Police Officer Mattamirea's DICVS video, Bates Stamp:  DEF 2254; BWC Video 2, Bates Stamp:  DEF 2261; Transcription of Statement, Los Angeles Police Officer Castillo, Bates Stamp:  DEF 1264 – 1314; Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898.

[31] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp:  DEF 1663 – 1757; Los Angeles Police Officer Morales's deposition, May 12, 2023, page 45; Los Angeles Police Officer Morales's deposition, May 12, 2023, page 61.

[32] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp:  DEF 1663 – 1757; Los Angeles Police Officer Morales's deposition, May 12, 2023, page 45; Los Angeles Police Officer Morales's deposition, May 12, 2023, page 48.

[33] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; POLICE, Law Enforcement Solutions, https://www.policemag.com/training/article/15346362/pre-attack-indicators; I was a weaponless defense, firearms, tactics instructor throughout my 38 law enforcement career and taught officer survival at the basic police academy.

5 – 10 feet away from their position when the shots were fired.  Officer Castillo stated she believed Michaelidis represented an immediate threat to her safety.[34]

- The tone of Voice:  Although Michaelidis did not speak a great deal during the event, his tone of voice sounded deliberate, aggressive, and agitated.  Although he spoke Armenian, he appeared to understand English (based on his verbal and non-verbal responses).[35]  It has been my experience that individuals who use hostile words can be a component of posturing before aggressive action.

- Hand and Torso Movements:  Michaelidis remained armed with two knives throughout his event despite numerous lawful orders to disarm.  Michaelidis can be seen on body-worn videos moving about while holding the knives.  In my experience, an individual considering an attack on a peace officer will typically maintain control of their weapon.[36]

- Head Movement and Eye Focus:  Michaelidis is seen on BWC throughout the event.  While facing west on Victory Boulevard (toward Officer Alverez, Castillo, and Garcia), he appears to shift his focus to the northwest (Officer Morales's approximate position) and then back to Officer Alverez, Officer Castillo, and Officer Garcia.  Later in the incident, Michaelidis acknowledged the positions of Officer Alverez, Officer Castillo, and Officer Garcia when he pointed toward them and counted aloud.  Based on my experience, individuals considering an attack on a peace officer will typically try to evaluate their proximity to the target and the ability of the officers to defend themselves.[37]

Based on my analysis Officer Morales (facing east) was positioned just north of Michaelidis and at a slight right angle.  Officer Morales believed Michaelidis's movement and deliberate gait created a real and imminent threat of death or serious bodily injury to other Los Angeles police officers armed with less-lethal weapons.   Officer Morales told FID investigators that if the less-lethal projectiles had failed to stop or sufficiently incapacitate Michaelidis, it would be doubtful

---

[34] Transcription of Statement, Officer Castillo, Bates Stamp:  DEF 1264 – 1314; Los Angeles Police Officer Castillo's BWC video, Bates Stamp:  DEF 2243; Transcription of Statement, Los Angeles Police Officer Alverez, Bates Stamp: DEF 1007 – 1086; Los Angeles Police Officer Morales's deposition, May 12, 2023, pages 66, 67,
[35] Los Angeles Police Officer Morales's deposition, May 12, 2023, page 68.
[36] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; Los Angeles Police Officer Castillo's BWC video, Bates Stamp:  DEF 2243; Los Angeles Police Officer Garcia's BWC video, Bates Stamp:  DEF 2245; Los Angeles Police Officer Morales's BWC video, Bates Stamp:  DEF 2252; BWC video 2, Bates Stamp:  DEF 2261, BWC video 3, Bates Stamp:  DEF 2262; I was a weaponless defense, firearms, tactics instructor throughout my 38 law enforcement career and taught officer survival at the basic police academy.
[37] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; Los Angeles Police Officer Castillo's BWC video, Bates Stamp:  DEF 2243; Los Angeles Police Officer Garcia's BWC video, Bates Stamp:  DEF 2245; Los Angeles Police Officer Morales's BWC video, Bates Stamp:  DEF 2252; BWC video 2, Bates Stamp:  DEF 2261, BWC video 3, Bates Stamp:  DEF 2262; I was a weaponless defense, firearms, tactics instructor throughout my 38 law enforcement career and taught officer survival at the basic police academy.

that Officers Castillo or Garcia would have had ample time to transition to their service pistol or safely retreat.[38]

When Officer Morales fired his service pistol to defend the lives of Officers Alverez, Castillo, and Garcia, he estimated Michaelidis was about 8-10' away from their positions.  His perception was not an outlier.  Officer Castillo told FID investigators she believed Michaelidis was close to her position (7 - 10' away and advancing) and that he represented an immediate threat when she fired a bean-bag shotgun.[39] Similarly, Officer Alverez told FID investigators that when Michaelidis walked toward her (Officer Alverez was standing behind the passenger door of her marked police vehicle, which was parked in the middle of Victory Boulevard), he was approximately five to ten (5-10') away and armed with a knife, when she heard the sound of gunfire.[40]

The material, in this case, demonstrates that when Michaelidis was advancing toward Officers Alverez, Castillo, and Garcia, Officer Morales believed they were in danger of an imminent threat of death or serious bodily harm because of his (Michaelidis) proximity to the offices while armed, his refusal to comply with lawful orders to stop, and his ability to initiate an attack. Officer Morales discharged his service pistol to defend Officers Alverez, Castillo, and Garcia from what appeared to be a pending attack by Michaelidis.[41]  Almost at the exact moment, Officer Mattamirea (40mm launcher), Officer McComas (40 mm launcher), and Officer Castillo (Bean-bag shotgun) each fired one less-lethal projectile, demonstrating they were also concerned that Michaelidis was advancing toward them (while armed) and possibly prepared to attack.[42]

Michaelidis's actions created a legitimate (imminent) threat of death or serious bodily harm.  In my experience, body dynamics (high stress) can impact or influence an officer's tactical performance.  Judging distances to a person or object are frequently affected, and visual and auditory perceptions are typically distorted.

Michaelidis demonstrated a unique ability to set aside any concerns that he could be shot with lethal or less-lethal projectiles.  Rather than voluntarily comply with the officer's lawful orders to stop and drop his weapon, Michaelidis elected to advance toward Officer Alverez, Castillo, and

[38] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp:  DEF 1663 - 1757.

[39] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Transcription of Statement, Los Angeles Police Officer Castillo, Bates Stamp:  DEF 1264 – 1314; Los Angeles Police Officer Castillo's BWC video, Bates Stamp:  DEF 2243; Los Angeles Police Officer Morales's BWC video, Bates Stamp:  DEF 2252; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp:  DEF 1663 – 1757.

[40] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Transcription of Statement, Los Angeles Police Officer Alverez, Bates Stamp:  DEF 1007 – 1086; Los Angeles Police Officer Alverez's BWC video, Bates Stamp:  DEF 2235.

[41]Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138 Los Angeles Police Officer Morales's deposition, May 12, 2023, page 9.

[42] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138 Los Angeles Police Officer Morales's deposition, May 12, 2023, page 12; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp:  DEF 1663 – 1757; Los Angeles Police Officer Morales's BWC video, Bates Stamp:  DEF 2252.

Garcia. [43] It is noteworthy that Michaelidis intentionally maintained control of at least one knife throughout the event and deliberately refused to comply with the lawful orders issued by several Los Angeles police officers.[44]

Based on the totality of the circumstances, my experience, and Michaelidis's actions, Officer Morales believed he (Michaelidis) possessed the ability, opportunity, and intent to assault Officers Alverez, Castillo, or Garcia.

- Ability:  Michaelidis was mobile.  He had full function of his limbs and was ambulatory.  Michaelidis understood English (although he spoke Arminian and periodically spoke to the officers).  Michaelidis's resolve was pronounced even though he could reasonably assume the officers were prepared to use force if he did not comply with their lawful orders to surrender peacefully.  His collective actions created the perception of an imminent threale of death or serious bodily harm.

- Opportunity:  Michaelidis had a chance to initiate an assault on Officers Alverez, Castillo, and Garcia.  He was between 5-10' away from Offices Alverez, Castillo, or Garcia, armed with at least one knife and advancing.  Michaelidis had the means necessary to complete an assault.  He demonstrated the necessary knowledge, skills, and capacity to use an edged weapon before and during the standoff.  Michaelidis noted where Officers Alverez, Castillo, and Garcia were positioned and deliberately advanced on their position.

- Intent: Michaelidis created the perception that he intended to physically contact or attack Officers Alverez, Castillo, or Garcia when he refused to comply with their lawful orders to stop and drop his knife.  At one point in the event, Michaelidis switched his focus from Officer Morales (further west and north of Michaelidis) to Officers Alvarez, Castillo, and Garcia, who were less than 10' away, which suggests they were his target.  An officer with similar training and experience could reasonably assume Michaelidis did not intend to comply with the lawful order to stop, drop the knife, and peacefully surrender.  In total, Michaelidis advanced at least 30' in the direction of the officers before force was used to stop him.  When Michaelidis was so close that his actions represented an imminent threat of death or serious bodily harm, Officer Morales had no other viable option to stop Michaelidis from reaching and possibly assaulting Officers Alverez, Castillo, or Garcia.

**Opinion 4:** It is my opinion that the Los Angeles Police Department's policies provided in this case are consistent with the statewide standards, procedures, and guidelines for contemporary law enforcement agencies.

---

[43] Los Angeles Police Officer Morales's deposition, May 12, 2023, pages 67, 69.
[44] Los Angeles Police Department, FID Report, Bates Stamp:  DEF 0870 – 0898; Los Angeles Police Chief M. Moore's Intradepartmental Correspondence, Bates Stamp:  DEF 2111- 2138; Transcription of Statement, Los Angeles Police Officer Morales, Bates Stamp:  DEF 1663 – 1757, Los Angeles Police Officer Morales's BWC video, Bates Stamp: DEF 2252, Los Angeles Police Officer Castillo's BWC video, Bates Stamp: DEF 2243.

**Opinion 5:**

In my opinion, based on the documents and material, in this case, I did not see any evidence
suggesting the defendants, the City of Los Angeles, or Officer Morales's conduct in the discharge
of their official duties or fell below the standard of care in the law or policies related to probable
cause for the contact, detention or arrest, or the use of force.

I, Phillip L. Sanchez, affirm that the above-expressed expert opinions are well-considered and
solidly based on the recognized police standards.

PHILLIP L. SANCHEZ

6 - 23 - 2023
DATE